

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-13-00439-CV

WISE ELECTRIC COOPERATIVE, INC.                                    APPELLANT/APPELLEE

V.

AMERICAN HAT COMPANY                                              APPELLEE/APPELLANT

----------

FROM THE 97TH DISTRICT COURT OF MONTAGUE COUNTY
TRIAL COURT NO. 2007-0000383M-CV

----------

## OPINION

----------

### I. INTRODUCTION

Appellee and Cross-Appellant American Hat Company (AHC) sued Appellant and Cross-Appellee Wise Electric Cooperative, Inc., for negligence following a catastrophic grass fire that consumed roughly 1,200 acres and was caused by an overhead service wire becoming disconnected at a Wise Electric utility pole. Thick smoke from the fire damaged AHC's inventory of 490,092 hats

and "hat bodies"; much of this inventory was stored in twelve forty-foot sea containers parked outside AHC's western-hat manufacturing plant in Bowie, Texas. Following a five-day bench trial, the trial court issued sixty-four findings of fact and seventeen conclusions of law[1] and signed a judgment awarding AHC $13,385,969.37 in personal property damages and $5,100,379.00 for past lost-profits damages. The judgment also awarded Wise Electric a $49,188.31 credit and an offset of $2,578,067.00. AHC and Wise Electric both perfected appeals.[2]

Wise Electric raises seven issues on appeal; six issues challenge various aspects of the trial court's damage findings, and one issue challenges the trial court's finding that Wise Electric was negligent.[3] AHC appeals the $2,578,067.00 offset. We will affirm the trial court's judgment on negligence and damages, and we will reverse the judgment's offset award and remand that claim to the trial court.

---

[1]A copy of the trial court's findings of fact and conclusions of law is attached to this opinion as Appendix A.

[2]We note at the outset that this case was previously tried and appealed. *See Am. Hat Co. v. Wise Elec. Coop., Inc.*, No. 02-09-00368-CV, 2010 WL 4028098, at *8–9 (Tex. App.—Fort Worth Oct. 14, 2010, pet. denied) (mem. op.). In the first appeal, we reversed the trial court's judgment and remanded the case for a new trial. *Id.*

[3]The arguments and authorities section of Wise Electric's brief is not tethered to the specific issues raised by Wise Electric; some of the headings in the arguments and authorities section raise arguments not subsumed within any issue, and some issues raise arguments not discussed in the arguments and authorities section. We liberally construe Wise Electric's issues and address every argument fairly subsumed in them. *See* Tex. R. App. P. 38.1(f) (providing that issue will be treated as covering every subsidiary question fairly included).

## II. OVERVIEW OF FACTUAL BACKGROUND[4]

The fire giving rise to this lawsuit originated at Wise Electric pole meter number 04610 located on Charles Anderson's property in Wise County. In 1998, Wise Electric had installed an overhead service line at the pole utilizing a Burndy Insulink connector. The electrically-charged overhead service line became disconnected from one end of the Insulink connector, and the disconnected line contacted the ground wire on the pole, which caused electrical arcing. The arcing melted the ends of the metal wires in the disconnected line, and molten metal fell to the underlying dry grass. It was a dry, windy day, and the grass ignited, resulting in the fire.[5] In addition to approximately 900 to 1,200 acres of native grass, several structures, vehicles, and campers were consumed. Thirty-three fire trucks, an EMS vehicle, twenty other types of vehicles, and over one hundred fire-fighting personnel responded to assist in containing and extinguishing the fire.

The fire burned past the back of AHC's western-hat manufacturing plant, burning barrels of lacquer located behind the factory and generating heat

---

[4]A more detailed review of the evidence pertinent to Wise Electric's sufficiency challenges is set forth in connection with our disposition of those issues.

[5]The Fire Chief for the Bowie Fire Department—Doug Page, Wise Electric's assistant manager—Kelly Myers, AHC's electrical engineer and certified fire and explosion experts—John Stewart and Freeman Reisner all testified that they had investigated the fire and that the above sequence was how the fire started.

sufficient to cause bricks to pop from the building. Heavy smoke from the fire engulfed the plant, which housed machinery, some hat inventory, and some completed hats awaiting shipping. The smoke was so dense around the plant that visibility in that area was limited to ten feet and surrounding roads were blocked off. The smoke, soot, and ash penetrated AHC's plant, entering through the ventilation system and from under the doors and sullying the plant's walls, floors, and machinery. The smoke also penetrated the twelve forty-foot sea containers that were filled with additional hat inventory.[6] A strong smoke stench saturated AHC's entire inventory of 490,092 western hats that were in various stages of completion and were stored either in the plant or in the sea containers. Photos were introduced into evidence showing the devastation wrought by the fire at and around AHC's plant. An outside company was hired to clean the plant, and AHC had to stop its manufacturing processes until the plant and equipment had been cleaned and until it had obtained new hat inventory.

### III. ATTACK ON PRIOR JUDGMENT

In its seventh issue, Wise Electric requests that we reinstate the jury's damages findings from the first trial. Wise Electric asserts that this court erred in

---

[6]AHC's commercial property and casualty insurer—Traveler's Lloyds Insurance Company—later rented five additional sea containers to store the hat inventory from AHC's plant while the plant and equipment were cleaned after the fire. Traveler's Lloyds Insurance Company merged with Saint Paul Fire and Marine Insurance Company in 2004 to become Saint Paul Lloyds. Consequently, in the record, AHC's insurer is referred to both as The Travelers Lloyds Insurance Company and Saint Paul Travelers. For purposes of this opinion, we refer to AHC's insurer as Travelers.

4

the reverse-and-remand judgment we issued after the first appeal in this case.[7] But Wise Electric petitioned the Texas Supreme Court to review that judgment, the Texas Supreme Court denied Wise Electric's petition, our mandate issued, and the case was remanded to the trial court and retried. Thus, our plenary jurisdiction over our judgment in the first appeal has expired. *See* Tex. R. App. 18.1, 19.1; Tex. Gov't Code Ann. § 22.225 (West Supp. 2014). We lack jurisdiction to reinstate the jury's damage findings from the first trial. *See* Tex. R. App. P. 19.3 (listing limited actions appellate court may take after expiration of plenary power over judgment), 43.2 (listing types of judgment an appellate court can render); *see also Browning v. Prostok*, 165 S.W.3d 336, 345–47 (Tex. 2005) (recognizing that only void judgments are subject to collateral attack and that a judgment is void only when court had "no jurisdiction of the parties or property, no jurisdiction of the subject matter, no jurisdiction to enter the particular judgment, or no capacity to act"). We overrule Wise Electric's seventh issue.

## IV. WISE ELECTRIC'S EVIDENTIARY-SUFFICIENCY CHALLENGES

Wise Electric's first, second, third, and fifth issues challenge the legal and factual sufficiency of the evidence to support the trial court's findings of fact concerning Wise Electric's negligence and AHC's damages.

---

[7]*See Am. Hat Co.*, 2010 WL 4028098, at *8–9.

5

## A. Standards of Review

A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions and are reviewable for legal and factual sufficiency of the evidence to support them by the same standards. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see also MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009). We defer to unchallenged findings of fact that are supported by some evidence. *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014). We review de novo the conclusions of law drawn by the trial court from the facts to determine their correctness. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Because a trial court's conclusions of law are not binding on us, we will not reverse a trial court's judgment based on an incorrect conclusion of law when the controlling findings of fact support the judgment on a correct legal theory. *See, e.g.*, *Karns v. Jalapeno Tree Holdings, L.L.C.*, 459 S.W.3d 683, 690 (Tex. App.—El Paso 2015, pet. denied) (citing *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998)).

We may sustain a legal-sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital

6

fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally-sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing

all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

## B. Negligence

In a portion of its fifth issue, Wise Electric argues that the evidence is legally and factually insufficient to prove that it was negligent and that its negligence was the proximate cause of the fire. Wise Electric's fifth issue indicates that it challenges findings of fact 12, 13, 15(2), 19, 20 through 25, and 39 and conclusions of law 1, 2, 3, 5, 7, and 8.[8]

### 1. The Elements of Negligence

To sustain a negligence action, the plaintiff must produce evidence of a legal duty owed by the defendant to the plaintiff, a breach of that duty, and damages proximately caused by that breach. *See, e.g.*, *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001). The components of proximate cause are cause in fact and foreseeability. *See, e.g.*, *Doe v. Boys Clubs of*

---

[8]Wise Electric's brief fails to include any discussion of most of the findings of fact and conclusions of law that Wise Electric purports to challenge by listing them parenthetically after its issues. Despite this absence of a discussion of evidence, we nonetheless liberally construe Wise Electric's brief as challenging the sufficiency of the evidence to support the findings listed parenthetically after each of Wise Electric's issues. *See* Tex. R. App. P. 38.1(f).

8

*Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). The test for cause in fact is whether the negligent "act or omission was a substantial factor in bringing about injury," without which the harm would not have occurred. *Id*. Foreseeability requires that a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission. *Id.* (citing *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 549–50 (Tex. 1985)). The danger of injury is foreseeable if its "general character . . . might reasonably have been anticipated." *Nixon*, 690 S.W.2d at 551 (quoting *Carey v. Pure Distrib. Corp.*, 124 S.W.2d 847, 849 (Tex. 1939)).

### 2. Evidence of Breach and Causation

The evidence conclusively established that the fire started when an overhead service line at a Wise Electric utility pole located on the Anderson property (pole number 04610) became disconnected from one end of a Burndy Insulink connector. The dispute at trial centered on *why* the service line became detached from the connector. AHC asserted that the service line became detached because a Wise Electric lineman had negligently installed the service line into the Burndy Insulink connector by failing to crimp one end of the connector—the end from which the wire became disconnected—and by failing to perform a tug test on the line. Wise Electric, on the other hand, asserted that several possibilities could not be eliminated, including that the service line had become disconnected by high winds or by someone intentionally disconnecting it or that the service line had failed prior to the fire.

9

### a. Testimony of Doug Page

Doug Page is the Fire Chief for the City of Bowie, Texas. He responded to the November 27, 2005 fire that started around noon that day; he finally cleared the fire scene at approximately 10 p.m. that night. Page investigated the cause and origin of the fire and generated a report that was admitted into evidence. He testified that the fire started at Wise Electric utility pole number 04610; at the top of that pole, he "could see a connector that was loose from an electrical line." The loose line grounded and started the fire. He had no doubt how the fire started; the proximate cause of the fire was the electrical short at the utility pole. The resultant fire was a wildland fire; wildland fires generate "a lot of ash." Page said that wind gusts reached sixty miles per hour that day.

### b. Testimony of Kelly Myers

Wise Electric's assistant manager Kelly Myers testified that he had worked at Wise Electric for thirty-one years; he said that he was the person at Wise Electric most knowledgeable about the November 27, 2005 fire that started around noon at utility pole number 04610 on the Anderson property in Wise County. Myers explained how a Wise Electric lineman attaches a service line to a utility pole using a Burndy Insulink connector, as was used to connect the overhead service wire at Wise Electric pole number 04610 when it was installed in 1998. The Insulink is an insulated metal barrel containing a conducting gel, its two ends have caps, and it is used for "end-to-end" connections. Myers explained that Wise Electric's linemen strip the insulation from the ends of the

10

service line and insert the uninsulated ends of the lines through the cap into each end of the Insulink and then "crimp" the Insulink on both sides with a tool to ensure a good connection and to ensure that the service line does not disconnect.

Two crimping tools were available in 1998—a ratchet masher and a black-handle Kearney tool. A ratchet masher is a special tool that is designed to mechanically ratchet down to apply a certain amount of compression pressure, and it does not release until the crimp is complete; Myers explained that "[e]ach time you squeeze that handle, it [the ratchet masher] moves a segment to crimp and it holds that." The ratchet masher makes one large crimp. The black-handle Kearney tool is more like pliers and has smaller jaws, and a lineman using it must make three individual crimps with it on each side of the Insulink. Myers explained that a Wise Electric lineman installing a service line on a pole in 1998 would have used the ratchet masher for crimping.

During his testimony, Myers identified various photos of the wires on pole number 04610 after the fire, as well as photos of the actual Insulink from which the overhead service wire had become detached. Myers testified repeatedly that although the photos showed visible crimping on the left-hand side of the Insulink, there was no crimping visible on the right-hand side of the Insulink—the side from which the service wire had become disconnected.

A plastic bag containing the actual service wire, which had been cut from pole number 04610 with the Insulink still attached to one side, was introduced

11

into evidence. Myers was asked to try to pull the wire out of the Insulink, and although he pulled—and was asked to pull harder—he was unable to pull the wire out of the Insulink. He again agreed that the other side of the Insulink, the side from which the service wire had become disconnected, did not have any markings showing that a ratchet masher or any other type of instrument that would crimp that side had been applied to it. The trial court, acting as the finder of fact in this bench trial, requested that this exhibit be handed to him to look at.

Myers then conducted an in-court demonstration of how a Wise Electric lineman would have connected the service line to the Insulink in 1998 at pole number 04610. First, utilizing a knife, Myers peeled back the plastic coating on two pieces of service wire, exposing about three-quarters of an inch of bare wire on each. He inserted the exposed ends of the service wires through the caps into the ends of the Insulink. After inserting the two wires into the ends of the Insulink, Myers explained that the Insulink then needed to be crimped to make sure the wires did not come out of the Insulink. Before performing the crimping, Myers was asked to pull one of the wires out of the Insulink and was able to easily pull out the wire. Myers then utilized a ratchet masher to crimp both sides of the Insulink. He thereafter performed a "tug test," tugging on the service wire to be sure it was securely crimped in the connector; he was unable to pull the service wires out of the Insulink. Myers explained that a proper crimp permanently attaches a service line to the connecter. Once a service line has

12

been inserted into an Insulink and properly crimped, it can never be removed; the wire must be cut to separate it from the connector.

Myers agreed that Wise Electric's policies required linemen to crimp both ends of a crushable connector like the Insulink every time, no exceptions; that a lineman using ordinary care was required to crimp both sides of an Insulink connector; and that the failure to do so would be the failure to use ordinary care. Myers also agreed that Wise Electric's linemen were taught to perform a tug test after crimping a line into a connector. Myers agreed that a Wise Electric lineman using ordinary care would perform a tug test on the line on each side of a connector to ensure a proper connection and that the failure to perform the tug test would be a failure to use ordinary care. Finally, Myers agreed that it would be foreseeable to a lineman installing a service line in 1998 that the failure to crimp one side of a Burndy Insulink could result in the service line becoming disconnected from the Insulink.

Upon questioning by Wise Electric's counsel, Myers testified that the Burndy Insulink installation instructions do not mention a tug test; the tug test is a safety practice taught to linemen. Myers said that Wise Electric no longer uses the Burndy Insulink connectors because the linemen cannot view the connection inside the barrel of the Insulink, as they can in some other types of crushable connectors.[9] And finally, when asked whether there was "any external evidence

---

[9]Myers also testified that Wise Electric no longer used Burndy Insulink connectors because of slippage within the barrel of the Insulink, but Myers

13

on the sleeve of the Insulink that would indicate either an attempted or partial crimp on the end of the Insulink" that the service wire became disconnected from, Myers testified, "I'm not sure what that is, but that could be where a crimp may have been made." He explained that "it's possible there could have been a partial crimp" and that the conductive gel inside the Insulink "helped hold it [the wire] in there."

On redirect, Myers was impeached with his testimony from the first trial in which he unequivocally testified that Wise Electric has standards concerning the work performed by lineman and that crimping both ends of a connector and performing the tug test were two such standards. He was also impeached with his prior trial testimony that when asked whether he had observed evidence of crimping on the end of the Insulink that the service wire became disconnected from, he answered, "No, sir."

### c. Testimony of Dennis Dale Waugh

Dennis Dale Waugh testified as an expert for AHC. Waugh had worked forty-two years for a utility company; he was a ground man, a first year through fourth year apprentice, a journeyman lineman, a lead journeyman lineman, and a troubleshooter. Waugh testified that the service wire that had become detached

---

admitted that there was "no material slippage shown by the photograph of the Insulink" at issue here. Myers also performed a second in-court demonstration of inserting exposed service wires into an Insulink in an effort to demonstrate the slippage he had testified sometimes occurred. Despite his efforts, he was unable to generate slippage during the demonstration.

from the Insulink at pole number 04610 became disconnected because there was no crimp on the side of the Insulink that the service wire became disconnected from. He said that the disconnected service wire showed signs of arcing because portions of the wire had melted and that two of the internal strands of the wire were shorter, indicating that they had burned off.

Waugh said that he had used a Burndy Insulink connector thousands of times, had utilized the ratchet masher thousands of times, and had used the black-handle Kearney tool thousands of times. When asked "what is the proper procedure a lineman must follow to properly install an Insulink connector," Waugh responded:

> Well, first, he measures his wire, skins the insulation of it off, and makes sure that he doesn't have more insulation off than what the sleeve will accept. And as I said, I usually put in one end, crimp it, and then install the other end, crimp it. And then do a tug test to make sure that it's a good connection, and then usually go to the meter base or some facility that's handy and check voltage.

Waugh performed an in-court demonstration of the proper procedure for a lineman to follow to install an Insulink connector, and he utilized the black-handle Kearney tool to perform the crimps. After performing the crimps with the black-handle Kearney tool, Waugh pointed out that three jaw marks of the black-handle Kearney tool were visible on the exterior of the Insulink connector. Waugh explained that after crimping both sides of the Insulink, the next step is performance of a tug test and then a voltage check. Waugh testified that a voltage check will not let the lineman know if the connector has been properly

15

crimped because voltage may still pass through a service line connected with an Insulink, even if it is not crimped at all. This is because the conducting gel inside the Insulink is tacky and permits conduction even in the absence of a crimp.

Waugh explained that a lineman performing crimps with either the black-handle Kearney tool or the ratchet masher knows whether they have performed the crimp in the proper place on the barrel of the Insulink because if a crimp is performed in the wrong place on the Insulink, "you're crimping air. You're not crimping any metal. There's no resistance to the connector tool." Waugh said that a properly-crimped Insulink should be able to support a man hanging from it; he had seen a service wire connected with an Insulink "hold up poles that are off the ground, also large tree limbs laying across services." Waugh further stated that a properly-crimped Insulink is a permanent connection that will not be blown apart by wind, even sixty-mile-per-hour wind.

Waugh testified that the foreseeable consequence of the failure to crimp one side of an Insulink connector is that the electrically-charged service wire will come out of the connector, come into contact with something, and cause a fire. He opined that no tug test had been performed on the service line that became disconnected from the Insulink. And he explained how the service wire had not become disconnected earlier, despite the lack of a crimp:

> Well, I think the cap on the end of this sleeve had something to do with it. It's going to hold the wire. Especially if they get a little bit of insulation in there with it, it's going to hold that wire. When that cap gets hot or weather-cracked, a piece of it fell off, that allowed the

16

wire to be in the connector free. We don't know when that happened.

### d. Testimony of John Stewart

AHC's expert John Stewart is an electrical engineer, a licensed professional engineer, and a certified fire and explosion investigator. Stewart's testimony from the first trial was admitted as an exhibit during the second trial. Stewart investigated the November 27, 2005 fire that started at pole number 04610. In addition to offering an opinion on the cause and origin of the fire, Stewart opined that the energized overhead service line became disconnected from the Burndy Insulink connector because the connector had not been crimped on the side from which the wire became disconnected. Stewart reviewed photos of the Insulink in question and pointed out visible crimping on one side, while the other side contained no crimping marks whatsoever. Stewart testified that to properly install an Insulink—using ordinary care in installing the Insulink, that is the care that a reasonable, prudent electric utility company would use—a lineman for an electric utility company should follow the manufacturer's instructions for installation, which included properly trimming the insulation on the wires, inserting the wires into the connector to the proper point, crimping both sides with a proper tool, and then pulling on the wires to ensure that a good crimp had occurred and that the wires would not pull out of the connector. Stewart opined that the failure to perform any one of these steps, including

17

crimping both sides of the connector or failing to perform the tug test, would be a failure to exercise ordinary care.

Finally, Stewart testified that he routinely relied on National Weather Service reports in conducting fire investigations and did so here; the report for November 27, 2005 for Decatur, Texas, was introduced into evidence and showed that the average wind speed at approximately 11:45 a.m. was 20.7 miles per hour with gusts to 31.1 miles per hour. Stewart opined that wind, no matter how strong, would not be capable of detaching a service line that had been properly crimped into a connector.

### e. Testimony of Freeman Reisner

AHC's expert Freeman Reisner testified that he worked as a consulting engineer for Haag Engineering where he performed failure analysis. Previously, he had worked for thirteen years for San Angelo Electric Service Company repairing distribution transformers and motors and other types of electric equipment. At Haag Engineering, he had performed at least 1,000 fire investigations. Reisner's testimony from the first trial was admitted as an exhibit in the second trial. When asked how a Burndy Insulink connector works, Reisner explained,

> The connector comes with a plastic cover and little caps on each end. And when two wires need to be connected, the connector, whoever is doing the connecting, strips the end of the wire so they're bare and they insert them one in each end -- typically, one at a time, and you insert them and then crimp in an area on the connector and check it; and then put another wire in the other end and crimp it and then check it. The ends are puncturable real easily by the wire so

18

you don't have to poke a hole in it or anything. You just poke the wires in either end.

Reisner testified that to properly join two wires, the connector attaching them must be crimped on both sides. He said that the Burndy Insulink connector at issue here showed no evidence that it was crimped on the side from which the service wire became disconnected. Finally, Reisner opined that the service wire became detached from the Burndy Insulink connector because it was not crimped on the side where it detached. According to Reisner, if an Insulink is properly crimped, it will hold a service line "indefinitely."

### f. Testimony of Forest Smith

Wise Electric's expert Forest Smith is an electrical engineer who works for "a company that does investigations primarily for insurance companies but sometimes other companies as well." He performed his investigation of the fire four days after it occurred. He testified that the Insulink that is the subject of the lawsuit was installed by Wise Electric but also noted that the utility pole had "Romex"[10] installed on it that was not installed by Wise Electric. He opined that the Romex "possibly could have" played a role in the fire because the person who installed the Romex would have had to stand on a ladder and therefore could have reached the overhead service wire and could have forcibly pulled the service wire from the Insulink in question.

---

[10]Romex is a wire used primarily for residential applications; these applications are usually not installed by electrical companies.

Smith testified that his investigation of the fire followed NFPA 921, which is a set of guidelines by a national consensus committee outlining the way to conduct a forensic investigation. Smith said that the investigations are to follow scientific method, which he described as follows:

> The scientific method is something that is taken from academia. It's common in classrooms. It's been adapted for forensic investigations. It begins by defining a situation, recognizing a need, then collecting data, and then analyzing the data. And then there's a process called inductive reasoning in which hypotheses are developed, and then there's a process called deductive reasoning in which hypotheses are eliminated. And then, finally, there is the stage in which a hypothesis, if it passed the test, becomes a theory, and then the theory becomes the basis for perhaps making a call on the cause of and the origin of a fire.

Applying the scientific method, Smith was unable to make a determination regarding the cause of the fire because he said an origin had not been determined. He did not determine that the area of origin was at pole number 04610; that was not in the scope of his investigation. Smith explained that, using the scientific method, he could not eliminate several hypotheses as possible causes for the service line becoming disconnected from the Insulink; he could not eliminate the possibility that the Insulink had failed prior to the fire, that the wind had caused it to disconnect, or that someone—"a party perhaps putting up this piece of Romex"—had forcibly pulled the service line out of the Insulink.

Smith testified that the construction of the Wise Electric utility pole complied with required regulations. He determined that Wise Electric used ordinary care in the construction of the pole. Although Smith testified in the first

trial that the service line disconnected because a lineman had failed to crimp the Insulink on that side, he asserted in the second trial that, after he had magnified a photo of the approximately two-inch Insulink into an eight-by-ten photo that was admitted as Defendant's Exhibit 1B, he had observed evidence of crimping on both sides of the Insulink.[11]  He said that there was one "small indentation" made by a black-handled Kearney tool on the side of the Insulink where the service wire had disconnected.  Smith was impeached with his prior testimony that the right side of the Burndy Insulink was not crimped and that it is reasonably foreseeable to a lineman that if he fails to crimp one side of a connector, the wire will come out.[12]

### 3.  The Evidence of Breach and Causation Is Legally and Factually Sufficient

In its findings of fact and conclusions of law, the trial court found that a service line will not become disconnected from an Insulink when it is properly crimped, that the Insulink in question at pole number 04610 was not properly

---

[11]At the trial court's request, Smith drew black arrows on Defendant's Exhibit 1B to point to the places where he purportedly saw evidence of crimping; no indentations are visible on the copy of the photo in the record.

[12]On appeal, Wise Electric proposes that the Insulink's defective design caused the fire.  In support of this assertion, Wise Electric directs us to Smith's testimony that some electric companies have discontinued using the Insulink. But Smith also testified that many electric companies still use them.  And although there is evidence (set forth in Smith's report) that other connectors may provide greater visibility of a crimp within the connector, no evidence exists in the record before us that the Burndy Insulink is defectively designed or incapable of proper installation.

21

crimped on both sides, and that Wise Electric had failed to use ordinary care when it failed to crimp both sides of the Insulink. The trial court found that if a lineman fails to crimp one side of an Insulink, it is reasonably foreseeable that the electrically-charged line inserted into the non-crimped end of the connector will come loose and that an injury of the kind suffered by AHC will occur. The trial court concluded that Wise Electric was negligent in its installation of the Insulink and that Wise Electric's negligence had caused the fire and the damages sustained by AHC.

Summarizing the evidence concerning these findings, neither Myers, Waugh, Reisner, nor Stewart could see any indication that the Insulink had been crimped on the side where the service line disconnected. Although Smith disagreed, not only with these witnesses but also with his testimony in the previous trial, the magnified, enlarged photographs of the Insulink show crimp marks on only the connected side. Moreover, the "slight indentation" that Smith testified in the second trial was observable on the uncrimped side of the Insulink could, according to Smith, only have been made by the black-handled Kearney tool; Myers testified that in 1998 when the Insulink was installed, Wise Electric linemen were using the ratchet masher. The crimped end of the Insulink in question was crimped with the ratchet masher, and no explanation was provided for why one end of the Insulink would be crimped with the ratchet masher while the other end of the same Insulink would not be crimped with the same tool but would instead be crimped with the black-handled Kearney tool. And finally,

22

although the black-handled Kearney tool requires three separate crimps, even Smith purportedly observed only one slight indentation on the uncrimped end of the Insulink.

Although Smith speculated that the service line could have become disconnected from the Insulink by someone climbing up a ladder to the overhead service line and forcibly yanking the service line out of the Insulink, Myers's in-court demonstration, during which he attempted to do exactly that from the witness stand, showed the impossibility of forcibly disconnecting a service line from a properly-crimped Insulink; it can be disconnected only by cutting the wire loose from the Insulink. According to Waugh, a service wire connected with a properly-crimped Insulink will support a man hanging from it, as well as ungrounded utility poles and tree limbs. Despite Smith's testimony that possibly the wind caused the service line to become disconnected, Stewart and Waugh opined that wind, no matter how strong, would not be capable of detaching a service line that had been properly crimped into a connector.

Viewing the evidence of the breach and causation elements of negligence in the light most favorable to the trial court's fact findings and disregarding the contrary evidence that a reasonable factfinder could, the evidence is legally sufficient to support the trial court's findings of fact 12, 13, 15(2), 19, 20 through 25, and 39. *See Rocor Int'l*, 77 S.W.3d at 262; *Cont'l Coffee Prods. Co.*, 937 S.W.2d at 450; *Leitch*, 935 S.W.2d at 118; *see also Cmty. Pub. Serv. Co. v. Dugger*, 430 S.W.2d 713, 715–18 (Tex. Civ. App.—Texarkana 1968, no writ).

23

Considering and weighing all of the evidence in the record pertinent to these findings, the credible evidence supporting the findings is not so weak, nor so contrary to the overwhelming weight of all the evidence, that the findings should be set aside and a new trial ordered. *See Pool*, 715 S.W.2d at 635; *Cain*, 709 S.W.2d at 176; *Garza*, 395 S.W.2d at 823. We overrule Wise Electric's legal and factual sufficiency challenges to the breach and causation elements of negligence challenged in Wise Electric's fifth issue, and we hold that the trial court's conclusions of law 1, 2, 3, 5, 7, and 8 are legally correct concerning breach and causation based on the trial court's fact findings.

We overrule this portion of Wise Electric's fifth issue.

### C. Inventory Damages

Wise Electric's first, second, and the remainder of its fifth issue challenge the legal and factual sufficiency of the evidence to support the trial court's findings of fact and conclusions of law concerning AHC's personal property inventory damages. Wise Electric challenges findings of fact 36 through 41, 53, 55 through 58, 63, and 64 and the legal correctness of conclusions of law 6, 7, and 10. The trial court found that AHC's entire inventory of 490,092 hats and hat bodies was smoke damaged, that the hats and hat bodies could not be cleaned, and that that the replacement value of the inventory was $13,385,969.37—the amount awarded in the judgment. Wise Electric questions the legal correctness of the trial court's conclusion of law that the replacement-value measure of damages applies, challenges the testimony of AHC's owner Keith Maddox and of

24

AHC's expert Steven Startz concerning the inventory's fair market value, and contends that the evidence is insufficient to support the amount of the inventory damages award and to establish that the fire was the only cause of damage to the inventory.

### 1. No Evidence of Preexisting Damage to Inventory

In the final portion of its fifth issue, Wise Electric argues that the evidence is insufficient to support the trial court's findings supporting conclusions of law 2 and 3 that the damage to AHC's inventory was caused solely or only by the fire. Wise Electric argues that because AHC had previously stored its large inventory of hats and hat bodies in a non-air-conditioned facility and because AHC had kept most of its inventory in sea containers outside its plant at the time of the fire, AHC's inventory of hats and hat bodies was already damaged by heat and moisture before the fire. But Wise Electric points to no evidence, and we have located none in the record, supporting this contention.

Instead, Maddox testified that, prior to the fire, employees at the AHC plant in Bowie used the inventory stored in the sea containers on a daily basis and that although the sea containers had breathe holes, nothing had ever entered the sea containers prior to the smoke and ash from the fire. Maddox testified that air and smoke could enter the holes but not moisture or water.[13]

---

[13]Maddox was not asked any questions about the design of the breathe holes—where they were located on the containers or whether they were hooded, screened, or louvered.

25

No witness testified that the inventory contained signs of damage from exposure to heat or moisture—only that after the fire, the inventory had suffered smoke damage. Moreover, actual hats and hat bodies from AHC's smoke-damaged inventory were introduced into evidence at trial, and the trial court as the finder of fact had the opportunity to observe the type of damage sustained by the inventory; no questions were asked at trial of any witness concerning any heat or moisture damage suffered by the inventory, and no such damage was pointed out as present on the hats and hat bodies introduced into evidence.

Viewing the evidence in the light most favorable to both the trial court's implied finding that no prior damage existed to AHC's inventory and its express findings that smoke particles from the fire penetrated AHC's plant and its storage containers, as well as the contents of the plant and storage containers, damaging the inventory contained therein, and disregarding the contrary evidence that a reasonable factfinder could, the evidence is legally sufficient to support the trial court's implied finding and express findings that AHC's inventory was not damaged by heat or moisture prior to the fire. *See Rocor Int'l*, 77 S.W.3d at 262; *Cont'l Coffee Prods. Co.*, 937 S.W.2d at 450; *Leitch*, 935 S.W.2d at 118. Considering and weighing all of the evidence in the record pertinent to these findings, the credible evidence supporting the findings is not so weak, nor so contrary to the overwhelming weight of all the evidence, that the findings should be set aside and a new trial ordered. *See Pool*, 715 S.W.2d at 635; *Cain*, 709 S.W.2d at 176; *Garza*, 395 S.W.2d at 823. Consequently, we hold that the trial

26

court correctly applied the law to these facts in conclusions of law 2 and 3 by concluding that the fire alone was the proximate cause of damage to AHC's inventory. *See, e.g.*, *BMC Software Belg., N.V.,* 83 S.W.3d at 794 ("Appellate courts review a trial court's conclusions of law as a legal question").

We overrule the remainder of Wise Electric's fifth issue.

## 2. Evidence Regarding the Value of AHC's Inventory

### a. Testimony of Keith Maddox

Keith Maddox, the owner of AHC, testified that he had been in the western-wear business for forty years and had been making and selling hats for nineteen years. He sold boots and hats and then owned and operated The Best Hat Store, a hat-manufacturing plant and retail hat store. The Best Hat Store sold cowboy hats manufactured by Stetson, Resistol, Bailey, and American Hat, as well as by The Best Hat Store. About fifty percent of hats sold by The Best Hat Store were manufactured by American Hat. The Best Hat Store manufactured only felt hats—pure beaver and fifty-percent beaver western and dress hats; these hats sold for between $450 and $800. Maddox purchased the hat bodies for these hats primarily from Winchester Hat Company.

Maddox purchased AHC in March 2003, but he had previously tried to purchase it in 1995 before he opened The Best Hat Store. In 1995, he had called the then-owners of AHC to see if they would consider selling the plant, inventory, and machinery of AHC. He toured the factory and obtained investors to fund the asking-price of $10,000,000, but the owners then raised the asking

27

price to $20,000,000, which Maddox knew he could not raise. In 2003, Maddox learned from a store in Houston that a one-half interest in AHC could be purchased for $2,700,000; he believed that "was a steal" and called an AHC salesman. He learned that Compass Bank owned AHC, so he called Compass Bank. Compass Bank had foreclosed on AHC and told Maddox that AHC would be sold within the week. Maddox immediately traveled to Conroe to tour the AHC facility; he was told at that time that he could purchase AHC, including all of its equipment and inventory, for $350,000 cash, payable within two days. Maddox borrowed the money, made the purchase, and characterized getting "$13 million worth of equipment for 300 – and inventory for 350,000 [as] an excellent deal." Maddox testified that the day after he purchased AHC in 2003, the fair market value of the inventory, equipment, and name was $13.5 million dollars. After operating AHC for about a year in Conroe, Maddox moved AHC's plant to Bowie, Texas. The interior of the Bowie facility was smaller, forcing Maddox to purchase twelve sea containers and place them in the plant's parking lot for storage of the majority of AHC's inventory of hats and hat bodies.

Maddox explained that AHC makes hats from felt or straw. The process of manufacturing each material is different, but all hats progress from a raw hat body, which is a stage-one hat; to a stage-two hat; and finally to a stage-three hat, which is a completed hat. Actual straw and felt hats at each stage of manufacturing were admitted into evidence.

28

Straw hats are made from rice paper, which is then hand-braided.  Stage-one straw hats are dampened, pressed, lacquered with a petroleum-based lacquer, spun, baked, and lacquered again before an AHC employee trims the hat, sews a wire in it, and then bakes and lacquers the hat again to make it a stage-two hat.  According to Maddox, the process of making a stage-one straw hat into a stage-two straw hat involves "twenty something" steps, about two hours of labor, and two days of drying time.  To make the stage-two straw hat into a stage-three hat, workers add "trim" to the outside of the hat and sew a sweatband inside the hat.  For straw hats, the transition from stage two to three requires about one hour of labor.

Manufacturing felt hats is more time consuming.  On receiving the unshaped felt hat body from a manufacturer, AHC shapes the crown using a manual machine that stretches the crown over a round wooden block.  The machine steams the hat and then blasts it with cold air, which "sets it."  AHC dampens and irons the brim and the crown and then lets the hat dry for a day.  Next, a trained employee sands the crown with a sander, while the hat is spinning, feeling the hat to ensure a consistent sanding.  If necessary, the employee represses the hat and restarts the sanding.  An employee then hand sands both sides of the brim.  At this point, the felt hat is a "stage[-]two, open crown."  If a customer prefers a "creased crown," AHC creases the crown with a machine.  Stage-three felt hats have hand-cut and hand-sewn leather "buckle

29

sets" on them and sweatbands[14] and liners sewed inside the hats. An average of three to four hours of labor is required to transition a stage-two felt hat into a stage-three felt hat. Some felt hats, however, demand much more labor time; as an example, Maddox testified that a mink felt hat requires seventeen steps and twenty-four hours of labor.

The price of a hat and the quality of a hat are partially dependent on the quality of the raw hat body used. Some types of felt hat bodies have more hair than others, giving them a better quality and value. Maddox testified that Belgium and Germany had previously, but no longer, provided felt inventory and that it was the best quality. At the time of the fire, AHC's inventory included felt hat bodies from Belgium and Germany. Maddox also testified that Taiwan had produced the best straw hat bodies, that AHC had "a big selection" of Taiwanese hat bodies at the time of the fire, but that Taiwan had stopped producing straw hat bodies. Since Taiwan's cessation of straw-hat production, AHC had acquired straw inventory from China, which Maddox considered inferior in quality to the Taiwanese hat bodies.

Maddox testified that historically, AHC had made the best hats because AHC had utilized the finest raw materials and had the best workmanship; AHC targeted "the more knowledgeable hat wearer[s]" as customers. AHC sold hats to independent hat stores, department and chain retail stores, as well as to

---

[14]Retailers sometimes request that the sweatband bear their logo or name.

individuals.  Maddox explained that when one of these department or chain retail stores placed an order for hats, the hats must ship within about forty-eight hours, or the order would be cancelled.  Consequently, because of the front-end labor time required to generate a stage-three, ready-to-ship hat, a hat-manufacturing plant must have a "gigantic inventory" of various types of felt and straw hats completed up to a stage-two or stage-three level in order to successfully do business with "the majors"[15] and to timely fill incoming orders.

Maddox testified that AHC's entire inventory was destroyed by the fire; all of the hats and hat bodies that were inside the plant and that were stored in the twelve sea containers reeked of smoke.  He said that "you can never get the smoke smell out of a smoke[-]damaged hat."  Maddox testified that "[n]o one would buy [smoke-damaged hats] and [that] no one with any reputation would sell them."  Maddox explained that when a hat is cleaned, it then has to be reshaped with steam and that when the steam hits the hat, the smoke smell intensifies.  He performed an in-court demonstration of how to shape one of AHC's smoke-damaged hats with steam, and a smoke smell arose in the courtroom.

Maddox testified that approximately five years after the fire, the owner of Outback Traders in Australia was at the AHC factory in Bowie, "and he wanted to know what was in all of those [sea] containers.  We opened one of them up[,] and

---

[15]A major retailer, according to Maddox, was a retailer such as Cavenders or Baskins that had over ten stores that were stocking AHC hats.

it was smoky." When Maddox was asked what he intended to do with all of the smoky hats and hat bodies in the containers, Maddox responded, "[T]hey're going to the landfill." The gentleman said that he would take some to Australia to sell because it is smoky in the outback. Maddox said that he did not think the smoky hats would sell, but the gentleman said that he was going to try. So Outback Traders purchased 1,330 of the completed, stage-three smoke-damaged hats at a "heavily discounted" price of $49,188.31. AHC generated four invoices to ship the smoky hats to Outback Traders, listing the items being sold as "inventory written off" followed by the type of hat. The invoices totaled the prices of the hats, then indicated "minus the total price in the place for payments or credits," and stated a balance owed as zero.

Maddox testified that Outback Traders was unable to sell the smoky hats and had not ordered any more smoky hats although it continued to order regular hats, as it had in the past. Two years after the sale of the smoky hats, an individual in Montague paid AHC for Outback Traders's purchase of the 1,330 smoky hats; Maddox testified that the individual made the payment out of friendship because the owner of Outback Traders felt bad that he had never paid for the hats. Maddox testified that AHC was not attempting to be awarded damages at trial for the inventory Outback Traders had tried to sell.[16]

---

[16]Consequently, the judgment awards Wise Electric a $49,188.31 credit for these hats because they were included in AHC's expert Steven Startz's inventory damage calculations.

32

### b. Testimony of Steven Startz

After the fire, Travelers hired Steven Startz to document, evaluate, and liquidate AHC's damaged hat inventory. Startz owns Startz Insurance Salvage, and he is a licensed and experienced salvor, which he defined as a documentation, evaluation, and liquidation specialist. Startz had prior salvor experience with smoke-damaged clothing. In Startz's experience, smoke odor cannot be removed from clothing.

On behalf of Travelers, Startz commissioned a national inventory crew. He and the inventory crew spent "two or three weeks" counting each and every hat and hat body that was visibly damaged and those that had a smoke odor. Startz reported that all 490,092 hats and hat bodies in AHC's inventory at the time of the fire had been damaged.

As part of the counting, Startz and his crew classified the damaged hats into their three stages of production: stage one, stage two, or stage three. They also categorized the damaged hats by their location at the time of the fire: either inside the plant or outside in the sea containers. Startz generated a 114-page spreadsheet itemizing each of the 490,092 hats and hat bodies by stage of manufacture, type, color, and location; he provided his report and the spreadsheet to Travelers and to AHC in 2005 after the fire.

Startz testified that while he was at AHC cataloguing AHC's smoke-damaged inventory, Servpro was also there; Servpro had been hired by

33

Travelers to attempt to clean the hats. But Servpro reported to Startz that they were having difficulty getting the smoke smell out of the hats.

In 2008, AHC hired Startz to assess the inventory's value. Utilizing the spreadsheet he had previously generated for Travelers that individually documented each of the 490,092 hats in AHC's inventory at the time of the fire, Startz requested invoices for the purchase of the various hat bodies. Purchase invoices did not exist for most of AHC's hat inventory because Maddox had purchased AHC out of foreclosure more than two and one-half years before the fire and had acquired its inventory without accompanying invoices. To determine a value for the inventory lacking invoices, Startz "utilized like-similar invoicing to come up with the values," which Startz said was standard practice in the salvor business.

To compile like-similar invoices, Startz compared the specific type of hat body catalogued in the spreadsheet (but lacking an invoice) to similar hat bodies offered for sale at the time of the fire by companies from whom AHC had purchased hat bodies for production. Startz's report explains that "[i]nvoices of purchases and price lists were utilized to accumulate values of the hundreds of types and styles of merchandise affected in your existing inventory."[17] Startz

---

[17]The record reflects that an almost infinite number of types of hat bodies exist. While the hat bodies are only straw or felt, the variations of hat bodies within those two categories is innumerable. For example, straw hat bodies are different sizes and can be made of a variety of types of paper (Chinese glazed or unglazed, Japanese glazed or unglazed, Collit yarn/paper, and twisted paper to name a few) and can be a variety of colors (wheat, ivory, ivory/tan, ivory/wheat,

34

averaged the invoice values for all felt hat bodies and for all straw hat bodies to arrive at an average cost for felt hat bodies of $40.25 each and for straw hat bodies of $5.43 each.

Then, as reflected in his report, Startz evaluated AHC's operating expenses, which he testified salvors commonly rely on in assessing value. He totaled AHC's yearly operating expenses, determined the average number of hats AHC manufactured per day for the calendar year preceding the fire, and came up with a cost per hat of $29.22 in operating expenses attached to each hat. He added this $29.22 cost-per-hat figure in computing the value of hats that had been manufactured into stage-two and stage-three hats but did not add it in computing the value of stage-one, raw hat bodies.

Next, Startz calculated the average labor costs associated with each stage of production. He determined that a stage-one hat, whether felt or straw, would have $0 labor costs added in assessing its value because no labor had yet been exerted on the raw hat body. Stage-two felt hats had an average labor cost of $54.11 per hat, and stage-two straw hats had an average labor cost of $4.60 per

natural, and space dyed wheat to name a few). Felt hats are different sizes (the hat body can only be made up or down one size) and vary by the fur used to make the felt (for example, rabbit, hare, beaver, and mink), by the amount of the animal hair that is actually in the felt (10X, 20X, 100X, 500X, or other amounts), and by color (for example, black, silver belly, and brown).

hat. Stage-three felt hats had accrued an average total labor cost of $67.64, and stage-three straw hats had accrued an average total labor cost of $5.75.

Based on these computations, Startz calculated the average replacement cost for each of the categories of hats in AHC's inventory—felt and straw hats at manufacturing stages one, two, and three—by totaling the average purchase-price cost of the hat body, the $29.22 operating expense per hat, and the average labor cost per hat, depending on its stage of completion. Startz arrived at the following 2005 replacement cost values:

| | |
|---|---|
| Felt hats stage 1 | $40.25 |
| Felt hats stage 2 | $123.58 |
| Felt hats stage 3 | $137.11 |
| Straw hats stage 1 | $5.43 |
| Straw hats stage 2 | $39.25 |
| Straw hats stage 3 | $40.40 |

Finally, to arrive at the total replacement value for AHC's entire inventory, Startz multiplied the number of hats in each of the above categories by the replacement value calculated for that category. AHC's inventory on the date of the fire included: 38,670 stage-one felt hats; 63,381 stage-two felt hats; 4,574 stage-three felt hats; 345,870 stage-one straw hats; 23,701 stage-two straw hats; and 13,896 stage-three straw hats. Performing the math, the total cost to replace the inventory AHC had on hand at the time of the fire is $13,385,969.37. The trial court admitted Startz's entire report, which included several invoices and documented his methodology.

36

Startz said that in 2005, as part of his duties for Travelers, he had attempted to "liquidate" AHC's inventory of completed hats; he put the completed, stage-three smoke-damaged hats on the market. But due to the amount of smoke damage sustained by the hats, interest in the finished hats waned quickly. Concerning the hat bodies and stage-two hats, Startz said that "[t]he hats that had not been finished had no market value due to their damage and their state of manufacture." Consequently, Startz opined at trial that in this case, the replacement cost as well as the pre-fire fair market value of all 490,092 hats was the same—$13,385,969.37.

### c. Testimony of Gary Moore

Gary Moore testified that he had worked in the western-wear business for Hat Co. for over twenty-six years. Hat Co. sold a variety of western hats, including Resistol and Stetson brand hats; during Moore's last few years at Hat Co., Hat Co. had about fifty percent of the western-hat market. Moore himself generated over $2,000,000 in sales for Hat Co. during each of his last few years of employment by selling new hats to retailers. Moore's duties with Hat Co. had also included quality control; he had experience with customers bringing in smoke-damaged hats to see if anything could be done to restore them.

Travelers had contacted Moore to examine AHC's inventory of hats that were smoke damaged by the fire and to express an opinion as to the condition of the hats, the marketability of the hats, and the refurbishing of the hats. Moore went to AHC's plant in Bowie. Moore testified, "Boy, you could smell those

37

trailers. . . . I was standing back from the trailers when they opened them, you know, roughly, ten feet. And when they opened the doors, it was just, you could smell that smoke just reeking out of there." Moore said the hats "were very smoked."

Moore explained that from 2005 through trial, there was no process in existence that would remove the smoke smell from a hat. He explained that heat "really brings out" the smoke smell from a smoke-damaged hat. Moore said that "[a]s long as you have that [smoke-damaged] hat, you're going to have that smell. Some days less; some days more, but you're always going to have a smoke smell." Moore reported his findings to Travelers: all 490,092 hats were smoke damaged and could never be effectively cleaned of the smoke smell. A copy of Moore's report to Traveler's was admitted into evidence.

Moore said that no market existed for the 490,092 hats he had inspected at AHC. He testified that there is no market for smoke-damaged hats; they are "not re-sellable. I mean, it wouldn't be reputable to sell them as new hats when they're damaged hats." Moore said that no retailer would be willing to stock smoke-damaged hats and further stated, "People will pick it up, smell the smoke, and, you know, that's it, they're going to go somewhere else." Moore testified:

> Q. Now, as a result of your observation and investigation when you went to the American Hat Company at the bequest or behest of Travelers, did you form an opinion as to what should be done with those hats?
>
> A. Well, yeah, I did.

38

Q. What was that opinion?

A. Dig a hole and put them in it and cover them up.

### d. Testimony of John Corn

John Corn is a retired forensic environmental chemist. He worked for Armstrong Forensic Laboratory for twenty-three years. Travelers hired Armstrong Laboratories to analyze AHC's hats to "determine if there was damage to these -- to the hats from a grass fire." Corn testified that Armstrong Laboratories had purchased two new AHC hats to be used as a control group and had received forty-two hats from thee different sources: a set of AHC hats that Blackmon Mooring had attempted to clean by vacuuming and wiping with a clean sponge; a set of AHC hats that Servpro had attempted to clean by vacuuming, steaming, and brushing; and a set of AHC hats that had not been cleaned and had visible dust, smoke residue, and smoke odor. Corn selected three to four hats from each source to test.

Corn explained that the testing for physical particles present on the hats was conducted as follows. A three-by-one-half inch rectangle was cut from the brim of the hats. Some of the brim-cut rectangles were analyzed under a microscope, some were subjected to a chemical analysis using a gas chromatograph with a mass spectrometer detector, and some were "desorbed with a solvent" and "injected a portion of that solvent into a gas chromatograph mass spectrometer." Corn explained that "we would analyze the VOC's [volatile organic compounds] first with a set of common chemicals. And then the semi

39

volatiles, we injected those into the mass spec again for another composite list of chemicals that are common to -- in the environment and fire products." Based on this analysis, two hats "show[ed] evidence of particulates with a morphology of soot," and one of the new hats showed a "one percent level of carbon particulates."

Concerning his testing for smoke odor, Corn testified that of the hats tested, only "one hat [] had a smoke odor but no detectable level of soot or carbon particulates," and "[n]one of the other hats had a detectable odor of smoke." Corn testified that, to determine whether the hats had a smoke odor, testing was conducted as follows:

> [Y]ou establish the odor you're looking for, which in this case would be an odor from burned grass. We gave the panel a couple of other soot odors like a match or burning wood, and then you -- you get a panel of five people. And from that panel, you -- they smell the soot that -- your known soot, and then they clean their nose so their olfactory won't have olfactory fatigue. And then they smell each of the products in a -- in a bag. And so we would use an odorless type of bag.
>
> Q. Does the -- does the -- does the group consist of people selected by you?
>
> A. Yes. We have -- we had several employees that were trained in this particular method[,] and we used people that were nonsmokers and who had experience doing this.
>
> Q. Did you find evidence in your review of smoke?
>
> A. Yeah, we found it in one.

Corn's report to Travelers was admitted into evidence; it indicated that none of the volatile organic compounds found on AHC's hats were associated

40

with a grass fire and that only one hat had a smoke smell. Corn opined that the hats he analyzed could be "easily cleaned by brushing with an appropriate material and [by] vacuuming with a HEPA filtered or remote vacuum." Corn's report stated that "hats with a discernible odor can be treated by placing a hat in a chamber that can be purged with heated filtered air."

On cross-examination, Corn conceded that he could not offer an opinion concerning any of AHC's 490,092 hats and hat bodies, other than the few he had analyzed. Corn was asked to open Plaintiff's Exhibit 95E—the bag containing AHC stage-three felt hats manufactured before the fire; he did so and testified that he smelled smoke. Corn agreed that he could not testify about the market value of anything because he was "not that expert." And when asked about the smoke removal process mentioned in his report, Corn explained that the hats would need to be unstacked and placed in a container and that

> all you're doing is you'll have fans with filters on them at one end. And you'll either -- you can either blow air into it or you can pull air out the other end through filters at this end. And just move air through it, so it's not a vacuum. It's just an air movement. And then you heat up the air inside the -- inside the container. These containers have been as big as boxcars and as small as a hat box.
>
> Q. So how long would it take 490,000 hats to go through that process? Hours? Days? Weeks? Months?
>
> A. Usually, we would recommend they do it for seven to fourteen days.
>
> Q. For each batch?

41

A.  Yes.

Q.  So two weeks, a boxcar full you say?

A.  Yeah. You can -- that's -- that's -- you could actually go with a bigger chamber than that.

Q.  Where is a bigger chamber than that?

A.  Well, you would construct it.

## 3.  Applicable Law on Valuing Negligently-Damaged Inventory[18]

The primary principle to be applied in awarding damages for negligent injuries to property is that the owner shall have actual pecuniary compensation for the loss sustained.  *See Int'l-Great N. R.R. Co. v. Casey*, 46 S.W.2d 669, 670 (Tex. Comm'n App. 1932, holding approved).  When the property negligently injured is personal property, the general rule in determining the amount of compensation due for the damage to the personal property is the difference between its reasonable market value immediately before and immediately after the damage at the place where the damage occurred.  *See Thomas v. Oldham*, 895 S.W.2d 352, 359 (Tex. 1995); *Celanese Ltd. v. Chem. Waste Mgmt., Inc.*, 75 S.W.3d 593, 598 (Tex. App.—Texarkana 2002, pet. denied).  Market value is defined as the price property would bring when it is offered for sale by one who

---

[18]The cases cited by Wise Electric for the proposition that a fair-market-value damage model is the only appropriate measure of damages are not negligent-damage-to-personal-property cases; they are conversion, eminent domain, or other types of cases.  Our discussion and our holdings here are limited to negligent-damage-to-personal-property cases, so we need not discuss the other types of cases cited by Wise Electric.

desires to sell, but is not bound to do so, and is bought by one under no necessity to purchase it. *See Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 374 (Tex. 2001).

Although negligent damage to personal property is usually measured by the diminishment in the property's fair market value attributable to the negligently-inflicted damage, different factual situations may dictate the application of a different valuation of the damage to the property. *See Pasadena State Bank v. Isaac*, 149 Tex. 47, 50, 228 S.W.2d 127, 128 (Tex. 1950); *Celanese Ltd.*, 75 S.W.3d at 598. For example, the personal property might be totally destroyed or may have no fair market value, requiring application of a fair-market-value-at-time-of-destruction valuation, replacement valuation, or repair valuation. *Pasadena State Bank*, 149 Tex. at 50, 228 S.W.2d at 128; *see also Waples-Platter Co. v. Comm'l Standard Ins. Co.*, 156 Tex. 234, 236, 294 S.W.2d 375, 376–77 (1956) (holding that damage to building and personal property as a result of fire negligently caused by defendant was to be measured by reasonable cash market value of the property at the time it was destroyed by the fire, or if it was not totally destroyed, by the diminution in its fair market value before and after the fire); *Hartford Ins. Co. v. Jiminez*, 814 S.W.2d 551, 552 (Tex. App.—Houston [1st Dist.] 1991, no writ) (recognizing that "[t]he measure of damages to [personal] property that is totally destroyed [by another's negligence] is its reasonable market value when destroyed"); *Shaw Tank Cleaning Co. v. Tex. Pipeline Co.*, 442 S.W.2d 851, 854 (Tex. App.—Amarillo 1969, writ ref'd n.r.e.)

43

(upholding replacement damages awarded by jury for destruction of crude oil storage tank by fire negligently caused by defendant).  When the damaged property "has neither a market value nor a real value, but it is shown what it would cost to replace or reproduce the article, then such cost is the measure of recovery."  *Int'l-Great N. R.R. Co.*, 46 S.W.2d at 670; *Pringle v. Nowlin*, 629 S.W.2d 154, 157 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.) (holding plaintiff entitled to replacement value of gold leaf professional sign located in the window of his leased law office when defendants intentionally destroyed it).  It is the plaintiff's burden to show which method of valuation, other than market value, is appropriate.  *See Moran Corp. v. Murray*, 381 S.W.2d 324, 328 (Tex. Civ. App.—Texarkana 1964, no writ) (reversing damage award for intrinsic value of trees because plaintiff failed to establish inapplicability of fair market value and replacement measure of damages); *Smith v. Dye*, 294 S.W.2d 452, 465 (Tex. Civ. App.—Galveston 1956, no writ) (same).

### 4. The Trial Court's Conclusion of Law that Replacement Value Was the Proper Measure of Damages Is Legally Correct

Wise Electric asserts that replacement value is not the proper measure of damages; Wise Electric insists that fair market value is the only allowable measure of damages, arguing that AHC's inventory had an ascertainable market value after the fire so that the replacement-value measure of damages does not apply.  AHC, on the other hand, characterizes its damages evidence as supporting the trial court's award of $13,385,969.37 in replacement-value

44

damages to its personal property (inventory) and, alternatively, diminution-in-market-value damages from a pre-fire market value of $13,385,969.37 to a post-fire market value of $0.[19]

It was AHC's burden to prove the applicability of a damage valuation other than the general rule of diminishment-in-market-value-before-and-after-the-damage valuation. *See Pasadena State Bank*, 149 Tex. at 52, 228 S.W.2d at 129 (recognizing plaintiff met this burden); *Moran Corp.*, 381 S.W.2d at 328 (stating rule). The trial court found that AHC had met that burden here by establishing that no post-fire market existed for AHC's 490,092 smoke-damaged hats and hat bodies, that the smoke-damaged hats and hat bodies could not be cleaned to permit their use or sale as cowboy hats, and that the smoke-damaged hats and hat bodies had a post-fire market value of $0. Wise Electric asserts that "no evidence" supports these findings—findings of fact 36 through 41, 53, 55 through 58, 63, and 64. Because Wise Electric's sufficiency challenges impact the correctness of the trial court's conclusion of law 6—that AHC's inventory had no post-fire market value—and conclusion of law 10—that the replacement-value damage model is applicable, we address Wise Electric's sufficiency challenges in connection with its challenges to the correctness of these conclusions of law.

Wise Electric argues that AHC's inventory has a post-fire market value because inventory, "by its very nature, exists to be sold by a seller to a

_____

[19]AHC informed the trial court that it was asserting both measures of damages, in the alternative, out of an abundance of caution.

purchaser" and also argues that a post-fire market value exists because Outback Traders purchased 1,330 smoky hats after the fire. Wise Electric's arguments, however, fail to take into account the fact that, as testified to by Startz and Maddox, AHC's inventory was comprised predominately of raw hat bodies; "only a small percentage of the hats had been completed." The final page of Startz's 114-page hat-by-hat inventory spreadsheet, which is attached to his report, shows that of the 490,092 hats and hat bodies in AHC's inventory at the time of the fire, 13,896 completed straw hats existed (2.8% of the inventory); 4,574 completed felt hats existed (0.9% of the inventory); 23,701 stage-two straw hats existed (4.8% of the inventory); 63,381 stage-two felt hats existed (12.9% of the inventory); 345,870 straw raw hat bodies—stage-one hats—existed (70.6% of the inventory); and 38,670 felt raw hat bodies—stage-one hats—existed (7.9% of the inventory).[20] Thus, 78.5% of AHC's inventory at the time of the fire consisted of raw hat bodies, 17.7% of AHC's inventory at the time of the fire consisted of stage-two hats, and only 3.7% of AHC's inventory at the time of the fire consisted of completed, stage-three hats.[21]

---

[20]In finding of fact 53, the trial court found that "[e]ach of the 490,092 hats in American Hat's Inventory on the date of the fire was inspected and valued by Steve Star[t]z."

[21]Because the percentages were rounded to the nearest tenth, instead of using the exact number calculated by dividing the inventory item into the total inventory, the total of the percentages equals 99.9% rather than 100.0%.

### a.  No Post-Fire Market Exists
### for AHC's Stage-One or Stage-Two Hats

As a matter of law, no post-fire market existed in Montague County, Texas, for 96.2% of AHC's inventory (all but the 3.7% of AHC's inventory consisting of completed hats) for four reasons.  First, juxtaposing the definition of fair market value—the price a willing buyer, who desires to buy but is under no obligation to buy, would pay to a willing seller, who desires to sell but is under no obligation to sell[22]—with the above facts concerning AHC's inventory after the fire, it is obvious that if the smoke-damaged stage-one raw hat bodies and the partially-manufactured stage-two hats are sellable, the "willing buyer" of 96.2% of AHC's inventory (all but the 3.7% of the inventory consisting of completed hats) is necessarily limited to hat-manufacturing companies.  That is, only one of AHC's competitors—a hat-manufacturing company—could ever be a "willing buyer" of raw straw hat bodies; raw felt hat bodies; partially-completed, stage-two straw hats; and partially-completed, stage-two felt hats.  If AHC as a hat-manufacturing plant is unwilling to manufacture hats from smoke-damaged hat bodies and to complete partially-manufactured, smoke-damaged stage-two hats, then why would one of its competitors be willing to buy smoke-damaged inventory to do so?  Any notion that AHC's competitors could constitute a market for AHC's smoke-damaged stage-one and stage-two hats is wholly unsupported by the

---

[22] *See, e.g.*, *City of Pearland v. Alexander*, 483 S.W.2d 244, 247 (Tex. 1972) (setting forth definition of fair market value).

record. And no evidence exists that raw hat bodies or partially-manufactured hats can be used for or manufactured into anything but hats.

Second, a fair-market-value damage model is based on the property's price on the open market at the place where the damage occurred; we have located no cases supporting the proposition that a small market limited to a company's competitors is a satisfactory market for determination of fair market value of unmanufactured or partially-manufactured property.

Third, a fair-market-value damage model is based on the difference in the property's fair market value before and after the damage "at the place where the damage occurred." *See Thomas*, 895 S.W.2d at 359 (requiring fair market value to be established at the place where the damage occurred); *Bass v. McClung Roofing Co.,* 575 S.W.2d 342, 344 (Tex. Civ. App.—Fort Worth 1978, no writ) (same). AHC is the only hat-manufacturing company in Montague County, Texas; there is no market in Montague County, Texas, besides AHC for raw hat bodies and stage-two hats.

Fourth, and most importantly, the only evidence Wise Electric points to as establishing that a post-fire market exists for AHC's stage-one and stage-two hats is the sale of 1,330 smoke-damaged stage-three hats to Outback Traders. But the sale of a small number of completed, stage-three smoky hats is no evidence of a post-fire market for smoky, raw hat bodies or for smoky, partially-manufactured, stage-two hats. AHC cannot be forced to manufacture the smoke-damaged raw hat bodies into completed hats and to finish manufacturing

48

the smoke-damaged stage-two hats into completed hats in order to enter the "market" that Wise Electric contends exists. *See, e.g.*, *Wicker v. Hoppock*, 73 U.S. 94, 99 (1867) ("The general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury. . . . The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed."). Basing AHC's damages on its future consummation of the finished manufacturing of 96.2% of its inventory into stage-three hats for purported sale in the Australian Outback does not return AHC to the position it occupied before the fire.

### b. No Post-Fire Market Exists for AHC's Stage-Three Hats

Concerning the 3.7% of AHC's inventory consisting of completed, stage-three hats, Maddox testified that at the time of the fire, AHC had $1.2 million of completed hat inventory ready to ship to fill orders that had already been placed. The evidence concerning whether a post-fire market existed for the stage-three hats included the following. Maddox testified, "No one would buy [smoke-damaged hats,] and no one with any reputation would sell them." When asked whether he had discussed with his customers the possibility of purchasing the smoke-damaged hats, Maddox testified that "I had customers assuring me that they didn't want smoke-damaged hats." After the fire, AHC even changed the color of the hat boxes their hats were sold in because customers were adamant that they did not want smoke-damaged inventory. Moore testified that the AHC's post-fire inventory in the sea containers reeked of smoke; he said that at the time

49

of trial, there was no process in existence to remove the smoke smell from a smoke-damaged hat. He testified that no market existed for smoke-damaged hats; they should be put in a hole in the ground and covered with dirt.

Maddox explained that after a hat is cleaned, it must be reshaped with steam; he conducted an in-court demonstration of how to put a crown in a hat by steaming it. As he was applying steam to the hat in the courtroom, a smoke smell emanated from the hat, intensifying as more steam was applied. Maddox testified that the smoke smell of a smoke-damaged hat will intensify as its wearer sweats and becomes hot. Likewise, Moore testified concerning the smoke smell of a smoke-damaged hat, "You're going to smell it any day, but you're going to smell it more when it is hot."

Corn testified about debris and microscopic particles on one-half-inch by three-inch rectangles that he had cut from the brims of eleven to fourteen hats. His conclusion was that particles associated with a grass fire were not present on the rectangles of these hats, but he agreed that he could not offer an opinion or conclusions concerning any untested hats. Concerning smoke damage, Corn testified that utilizing his panel of five Armstrong Lab employees sniffing the hats that had been placed in individual bags in a procedure performed in the air-conditioned laboratory, only one hat registered a smoke smell. He said that the smoke smell could be eradicated from all 490,092 hat bodies and hats by separating them from the stacked, nested position they were stored in; placing them in a yet-to-be-built, large warehouse-sized chamber in a position where air

surrounded all sides of the hats; heating air and pulling it or pushing it from end-to-end through the chamber; and leaving the batches of hats in the chamber for ten to fourteen days per batch.

Wise Electric argues that AHC's sale of 1,330 completed, stage-three smoke-damaged hats to Outback Traders in Australia for attempted sale in Australia is evidence that a post-fire market exists for AHC's smoke-damaged stage-three hat inventory. But Maddox testified this sale was a one-time trial sale; Outback Traders thought it could sell smoke-damaged hats in the Australian Outback because it was smoky there and because Maddox was willing to let them try. But the hats did not sell. Although Outback Traders continued to order new, non-smoke-damaged hats from AHC, it never again ordered any more smoke-damaged hats. And Startz testified that back in 2005 when he placed AHC's smoke-damaged stage-three hats on the market, interest in them waned when buyers learned they were smoke damaged.

### c. Replacement Value Is a Proper Measure of Damages

Because, as a matter of law, no post-fire market value existed in Montague County, Texas, for 96.2% of AHC's inventory (all but the 3.7% of AHC's inventory consisting of completed, stage-three hats), we overrule the portions of Wise Electric's first and second issues challenging the sufficiency of the evidence to support the trial court's fact finding that no post-fire market value existed for any of AHC's smoke-damaged inventory to the extent this finding includes the 96.2% of AHC's inventory consisting of stage-one and stage-two hats. Having

51

determined that as a matter of law no post-fire market existed in Montague County, Texas, for the 96.2% of AHC's inventory consisting of hat bodies and stage-two hats, we need not address Wise Electric's challenge to the factual sufficiency concerning this finding.

Viewing all of the evidence in the light most favorable to the trial court's fact findings that no post-fire market existed for any of AHC's smoke-damaged inventory and that the post-fire fair market value of AHC's smoke-damaged inventory was $0, to the extent these findings include the 3.7% of AHC's inventory consisting of completed, stage-three hats, and disregarding the contrary evidence because a reasonable factfinder could, we hold that the evidence is legally sufficient to support the trial court's finding of fact that no post-fire market existed for any of AHC's inventory to the extent it includes this 3.7% of AHC's inventory.[23] *See Cent. Ready Mix Concrete Co.*, 228 S.W.3d at 651; *City of Keller*, 168 S.W.3d at 807, 827; *see also Rocor Int'l,* 77 S.W.3d at 262 (explaining that a mere scintilla of evidence constitutes legally sufficient evidence and defining scintilla). Considering and weighing all of the evidence in the record

---

[23]If AHC's single sale—five years after the fire—of 1,330 stage-three smoky hats to Outback Traders can somehow be construed as establishing a market for all of AHC's remaining 17,140 completed, stage-three smoke-damaged hats, the trial court's judgment could be modified by lowering AHC's inventory damage award by $1,139,351.23. This figure is computed as follows: by taking the total value of all stage-three smoke-damaged hats—$1,188,539.54, and subtracting the credit already given to Wise Electric to exclude the 1,330 smoky hats sold to Outback Traders from AHC's inventory damage award—$49,188.31, the total equals $1,139,351.23.

52

pertinent to the trial court's finding that no post-fire market existed for any of AHC's smoke-damaged inventory and that the post-fire fair market value of AHC's smoke-damaged inventory was $0, to the extent these findings include the 3.7% of AHC's inventory consisting of completed, stage-three hats, the credible evidence supporting the finding is not so weak, nor is the contrary evidence so overwhelming, that the finding should be set aside and a new trial ordered. *See Pool*, 715 S.W.2d at 635; *Cain*, 709 S.W.2d at 176. We overrule the potions Wise Electric's first and second issues challenging the legal and factual sufficiency of the evidence to support the trial court's findings of fact 36 through 41, 53, 55 through 58, 63, and 64.[24]

Because AHC met its burden of establishing that no post-fire market exists for any of its smoke-damaged inventory, the general rule for measuring negligently-inflicted damages to personal property—that being the difference between its market value immediately after the injury at the place where the damage occurred—does not apply here. *See Pasadena State Bank*, 149 Tex. at 50, 228 S.W.2d at 128 (recognizing "that the personal property destroyed might not have a market value" triggering "variations in the way in which the method of determining damages may be stated" to achieve proper compensation for the

---

[24]For these same reasons, we reject Wise Electric's free-standing argument (not asserted in connection with any issue) that a distinction exists in this case between proof that AHC's smoke-damaged inventory had a post-fire market value of $0 and proof that AHC's smoke-damaged inventory had "no [post-fire] ascertainable market."

injury inflicted as a proximate result of the wrongful act complained of); *Int'l-Great N. R.R. Co.*, 46 S.W.2d at 670 (recognizing that replacement valuation is proper to compensate an owner for damage to personal property when no market value exists for the personal property damaged); *Pringle*, 629 S.W.2d at 157 (same). AHC elected application of the replacement-value damage model, and the trial court correctly concluded in conclusion of law number 10 that a replacement valuation applied to AHC's smoke-damaged inventory. *See, e.g.*, *Pasadena State Bank*, 149 Tex. at 50, 228 S.W.2d at 128; *Int'l-Great N. R.R. Co.*, 46 S.W.2d at 670; *Celanese Ltd.*, 75 S.W.3d at 598 (recognizing different factual situations may dictate application of a different valuation [i.e., other than fair market value] of the damage to the property); *Pringle*, 629 S.W.2d at 157 (same). We overrule the portions of Wise Electric's first and second issues challenging the legal correctness of the trial court's conclusion of law number 6—that AHC's inventory had no post-fire market value—and conclusions of law 10—that "the proper measure of damages [for all of AHC's inventory] is the replacement value of the inventory."

### 5. Wise Electric's Challenges to Maddox's and Startz's Fair-Market-Value-at-the-Time-of-Fire Testimony

In a portion of its first issue and in a portion of its second issue, Wise Electric challenges Maddox's testimony that the fair market value of AHC's

inventory at the time of the fire was $13.5 million dollars[25] and Startz's market-value testimony about AHC's inventory at the time of the fire.[26]   Concerning Startz's testimony, Wise Electric asserts that "(1) Startz's testimony lacked any reliable foundation, (2) Startz was never properly designated to testify as to the market value of American Hat's inventory, and (3) Startz was not qualified to testify on the market value of American Hat's inventory."   But, as discussed above, as a matter of law no post-fire market value exists for AHC's inventory of stage-one and stage-two hats, and legally and factually sufficient evidence exists to support the trial court's finding that no post-fire market value exists for AHC's stage-three hat inventory; therefore, the trial court correctly concluded that the replacement-value damage model applied.   In the absence of a post-fire market value and applying a replacement-value damage model, a challenge to the

_____

[25]In one sentence, Wise Electric also challenges Maddox's testimony that the post-fire market value of AHC's inventory was $0.   Because Moore—an expert with a background similar to Maddox's—testified without objection that there was no post-fire market for AHC's inventory of hats, if the trial court did somehow err by permitting Maddox to testify that AHC's inventory had a post-fire market value of $0, any such error was harmless.   S*ee Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 230 (Tex. 1990) (holding any error in admitting testimony of expert witness was harmless because it was cumulative of same testimony given by six other expert witnesses who testified at trial); *McKinney v. Nat'l Union Fire Ins. Co.*, 772 S.W.2d 72, 76 (Tex. 1989) (holding any error in admitting testimony of witness describing chemical pump was harmless because it was cumulative of admitted exhibit displaying pump and trial testimony of other witness about pump's function).

[26]Wise Electric does not challenge Startz's replacement-value testimony; instead, as set forth and addressed above, Wise Electric claims that replacement value is an incorrect measure of damages.

55

testimony concerning the pre-fire market value of AHC's inventory is meaningless. That is, the general rule of diminishment in fair market value before and after the damage cannot be applied if there is no post-injury fair market value. *See, e.g.*, *Pasadena State Bank*, 149 Tex. at 50, 228 S.W.2d at 128; *Int'l-Great N. R.R. Co.*, 46 S.W.2d at 670; *Pringle*, 629 S.W.2d at 157.

Likewise, because the trial court correctly applied the replacement-value damage model, a challenge to Startz's qualifications to offer alternative fair-market-value opinion testimony is meaningless; Startz's qualifications to offer replacement-value testimony are not challenged on appeal. Consequently, because no post-fire market value exists for AHC's inventory of 490,092 hats and hat bodies, we need not address the portions of Wise Electric's first and second issues challenging the alternatively-presented, pre-fire fair-market-value testimony of Maddox and Startz or the qualifications of Startz to offer replacement-value testimony.[27] *See* Tex. R. App. P. 48.1 (requiring appellate court to address issues necessary for final disposition of appeal).

---

[27]In the interest of judicial economy and because this case has been tried and appealed twice, we alternatively construe Wise Electric's brief as challenging Startz's qualifications to offer replacement-value testimony. The determination of whether a witness is qualified to testify as an expert is left largely to the trial court's discretion. *See* Tex. R. Evid. 702; *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996). We will not disturb the trial court's determination that an expert is qualified unless the trial court abuses its discretion. *See Broders*, 924 S.W.2d at 151. A trial court abuses its discretion when it acts "without reference to any guiding rules or principles." *Id.* (quoting *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995)); *see Larson v. Downing*, 197 S.W.3d 303, 304–05 (Tex. 2006). In close cases, we defer to the trial court's

56

To the extent that Wise Electric's complaint—that "Startz's testimony lacked any reliable foundation"—can be liberally construed to encompass a challenge to Startz's replacement-value testimony, we address it next.[28] In determining the admissibility of expert testimony, the trial court has broad discretion, and accordingly, we review its ruling for an abuse of discretion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006). In its role as

---

resolution of expert qualifications and will not reverse its judgment. *See Larson*, 197 S.W.3d at 304.

Here, Startz's testimony and résumé, which was admitted into evidence, establish that he possessed over twenty years' experience acting as a documentation, evaluation, and liquidation specialist—called a salvor—for insurance companies and large corporations concerning a variety of types of industries, including manufacturing, retail, food, and industrial. He has performed salvor work for insurance companies such as Travelers, Hanover, Zurich, AIG, Lloyds of London, and others and for companies such as Walmart, Coca-Cola, and Walt Disney. He has previously worked as a salvor concerning smoke-damaged clothing.

Based on Startz's testimony concerning his qualifications and his résumé chronicling his extensive experience as a salvor, we alternatively hold that the trial court did not abuse its discretion by determining that Startz's knowledge, skill, experience, and training concerning the documentation, evaluation, and liquidation of a variety of types of damaged goods qualified Startz to give an opinion that would be helpful to the finder of fact on that subject—his documentation, replacement valuation, and attempt to liquidate AHC's inventory of smoke-damaged hats. We overrule the portion of Wise Electric's second issue to the extent that it may be construed as complaining of Startz's qualifications to offer replacement-value testimony. *See, e.g.*, *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 500 (Tex. 2001) (holding that trial court did not abuse its discretion by determining expert witness was qualified to testify).

[28]Wise Electric states that "Startz's report and testimony are based on calculations that, even if supported by evidence, would only be probative of replacement value or lost profits, but not fair market value."

57

gatekeeper, the trial court is required to ensure only that the expert testimony is based on a reliable foundation and is relevant to the issues in the case. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 728 (Tex. 1998). The trial court does not determine whether the expert's opinion is correct but only whether the analysis used to reach the expert's conclusion is reliable. *Id.*; *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002).

Under rule of evidence 703, an expert's replacement-value opinion may be based on facts or data "perceived by, reviewed by, or made known to the expert at or before the hearing." Tex. R. Evid. 703. Such facts or data need not be admissible in evidence if they are "of a type reasonably relied upon by experts in the particular field." *Id.* Personal knowledge of the underlying facts or data is not required. *See* Tex. R. Evid. 602, 703; *Henderson v. State*, 14 S.W.3d 409, 412 (Tex. App.—Austin 2000, no pet.); 2 Steven Goode et al., *Guide to the Texas Rules of Evidence* § 703.3 (3d ed. 2002).

After Travelers hired Startz, for approximately three weeks Startz and his inventory crew painstakingly counted and categorized each and every hat body and hat in AHC's inventory of 490,092 hat bodies and hats. When AHC hired Startz to value this inventory, Startz familiarized himself with AHC's manufacturing process, and he requested information from AHC of the type that an expert in his field would customarily use and rely upon. The information consisted of his prior documentation of each item in AHC's hat inventory, invoices, like-similar invoices for invoice-lacking items transferred to Maddox with

58

the purchase of AHC, and average operating costs and labor costs incurred by AHC per-hat to manufacture the 87,082 stage-two hats and the 18,480 stage-three hats that were included, along with 384,540 stage-one hats, in AHC's total smoke-damaged inventory of 490,092 hats and hat bodies. In its role as gatekeeper, the trial court was required to ensure only that Startz's expert testimony was based on a reliable foundation and was relevant to the inventory damage issue in the case. *See Gammill*, 972 S.W.2d at 728. The trial court's role was not to determine whether Startz's opinion was correct but only whether the analysis used to reach his conclusion was reliable. *See id.*; *see also Zwahr*, 88 S.W.3d at 629. For the reasons detailed above, we hold that Startz's replacement-cost analysis was sufficiently reliable. *See Gulley v. State Farm Lloyds*, 461 S.W.3d 563, 576 (Tex. App.—San Antonio 2014, pet. denied) (holding opinion testimony of civil engineer expert that movement of foundation was caused by seasonal moisture, not plumbing leak, was sufficiently reliable). We overrule the portions of Wise Electric's first and second issues to the extent they assert that Startz "did not use reliable foundational data" and that his methodology is a "simple summation of numbers without any factual basis."

### 6. The Evidence Is Legally and Factually Sufficient to Support the Amount of the Replacement-Value Damages Found by the Trial Court

In portions of its first and second issues, Wise Electric complains that legally and factually insufficient evidence exists to support the amount of the trial court's inventory damage award—$13,385,969.37—as set forth in finding of fact

59

58 and conclusion of law 7. Wise Electric's sufficiency analysis is premised solely on two facts that it contends render the amount of the trial court's damage award against the great weight and preponderance of the evidence: (1) Maddox purchased AHC's equipment and inventory out of foreclosure in 2003 for only $350,000, and (2) Montague County Appraisal District's 2005 personal property appraisal of AHC's personal property was $200,000.[29] We review the evidence concerning the amount of the inventory damage award, and we address Wise Electric's two contentions in turn.

In 1995, eight years before he successfully purchased AHC out of foreclosure, Maddox raised $10,000,000 to purchase AHC, but the owner then raised the price to $20,000,000. In 2003, Maddox was told a one-half share in AHC could be purchased for $2,700,000 and believed this "was a good deal." When Maddox learned that AHC had been foreclosed on by Compass Bank, as AHC's landlord, he purchased AHC out of foreclosure by Compass Bank for $350,000 in a two-day, cash-only transaction.

Jeff Biggars, AHC's plant manager, testified by deposition at the first trial, and his deposition testimony was offered by Wise Electric as Defendant's Exhibit

---

[29]Wise Electric presented no expert testimony on the value of AHC's smoke-damaged hat inventory controverting Startz's valuation; it presented only Corn's testimony that no particles associated with a grass fire were present on the hats he had examined, that the five-person-smell-test revealed only one of the tested hats smelled like smoke, and that the smoke smell could be removed from the hats by the hot-air-being-forced-through-a-warehouse-for-seven-to-fourteen-days method.

127 at the second trial. Biggars testified that Maddox had purchased AHC out of foreclosure and agreed that AHC was a foreclosed entity no longer doing business at the time Maddox had purchased it.

Maddox characterized his purchase of AHC as "an excellent deal." He testified that at the time he purchased AHC, its inventory was worth $13,000,000 dollars. Moore testified that he did not know what Maddox had paid for AHC, but that if he had purchased it for $350,000, he had gotten a good deal; "I would have guessed he would have paid more than that."

Startz's testimony and report documented the replacement value of AHC's 490,092 hat bodies and hats through invoice prices and "like-similar invoice" prices of various types of AHC's hat bodies: invoice number 00607006—dated March 29, 2004, from Bollman Hat Company—for the purchase of 236 dozen hat bodies of three different types; invoice number 00638634—dated June 22, 2004, from Bollman Hat Company—for the purchase of 423 dozen hat bodies; invoice number SO-05302—dated August 5, 2005, from Sunflower Mercantile H.K. Limited in Hong Kong—for the purchase of 950 dozen straw hat bodies of assorted types; a July 25, 2005 faxed letter to AHC showing an increase in the purchase price of thirteen types of hat bodies of which AHC had ordered a total of 1,500 dozen from Sunflower Mercantile for the months of December 2004 and January 2005; invoice number AM 007-08—dated January 18, 2007, from Japan Braid Hat Mfg. Co., Ltd. in Japan—for the purchase of 700 dozen Bangkok paper hat bodies; and invoice number 01046893—dated March 11, 2008, from Bollman

Hat company—for 155 dozen wool felt hat bodies. The record also contains numerous pictures showing the enormous quantity of hats and hat bodies in AHC's inventory. And Startz's report details his hat-by-hat counting and cataloging of each of AHC's 490,092 hat bodies and hats, as well as his calculations (set forth above), to arrive at a total replacement value of $13,385,969.37.

Wise Electric asserts that the price at which Maddox purchased AHC is evidence of the inventory's fair market value—the amount at which the property (American Hat's inventory) was offered for sale by a willing seller (Compass Bank) and purchased by a willing buyer (Maddox). That is, Wise Electric claims the inventory cannot be worth $13,385,969.37 because Maddox paid only $350,000 for it. But a foreclosure purchase price is, as a matter of law, not "fair market value." *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537, 114 S. Ct. 1757, 1761 (1994). In *BFP*, the United States Supreme Court explained,

> Market value, as it is commonly understood, has no applicability in the forced-sale context; indeed, it is the very *antithesis* of forced-sale value. "The market value of . . . a piece of property is the price which it might be expected to bring if offered for sale in a fair market; not the price which might be obtained on a sale at public auction or a sale forced by the necessities of the owner, but such a price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular . . . piece of property."

*Id.* at 537–38, 114 S. Ct. at 1761. Thus, we hold that the evidence of Maddox's purchase price of AHC after Compass Bank's foreclosure is not evidence of the

fair market value or of the replacement value of AHC's inventory at the time of the fire. Although Wise Electric argues that if AHC, "which is wholly owned by Keith Maddox, is able to collect on the judgment entered below, he will have turned his $350,000 investment into a windfall," the record reflects that the windfall occurred when Maddox purchased AHC out of foreclosure.

Concerning the Montague County Appraisal District's personal property valuation for purposes of ad valorem taxes, Maddox testified that it was his understanding he could elect to report his personal property on either a fair-market-value basis or on a cost basis. He elected to report under the cost basis, which he testified was based on the portion of the $350,000 purchase price he attributed to the inventory—$200,000 for the inventory and $150,000 for the equipment and name. Shannon Shipp, a sales, marketing, and business professor at Texas Christian University and founding member and partner for a firm that specializes in damages calculations, explained that it is proper to report business personal property value at the "[l]ower of cost or market" for county tax appraisals. Shipp also testified that he had consulted the Montague County Appraisal District's office and was told that business personal property could be properly valued at the lower of cost or market value.[30] Thus, in light of the

---

[30]At Wise Electric's request, the trial court took judicial notice of sections 23.01 and 23.12 of the Texas Tax Code, governing, respectively, appraisals generally and appraisals of inventory by the chief appraiser and stating the general rule that appraisals are set at market value. *See* Tex. Tax Code Ann. §§ 23.01, .12 (West 2015). Rendition statements made by a business owner on the business's personal property, however, are made pursuant to section 22.01,

evidence—which the trial court was free to believe—that the appraised value of AHC's business personal property in the 2005 statement from the Montague County Appraisal District was based on cost, not on fair market value, the statements do not constitute evidence that the fair market value or the replacement value of AHC's inventory at the time of the fire was less than $13,385,969.37. And no testimony or evidence exists valuing the damage to AHC's hat inventory at a dollar amount lower than $13,385,969.37.

Viewing all of the evidence in the light most favorable to the trial court's award of $13,385,969.37 replacement-value damages for AHC's inventory of 490,092 hat bodies and hats, and disregarding any contrary evidence because a reasonable factfinder could, we hold that the award is supported by more than a scintilla of evidence. *See Rocor Int'l*, 77 S.W.3d at 262; *Cont'l Coffee Prods. Co.*, 937 S.W.2d at 450; *Leitch*, 935 S.W.2d at 118. Considering and weighing all of the evidence in the record pertinent to the trial court's finding that the replacement value of AHC's smoke-damaged inventory of 490,092 hat and hat bodies is $13,385,969.37, the credible evidence supporting the finding is not so weak, nor is the contrary evidence so overwhelming, that the finding should be set aside and a new trial ordered. *See Pool*, 715 S.W.2d at 635; *Cain*, 709 S.W.2d at 176. We overrule the portions of Wise Electric's first and second

which authorizes a "good faith estimate of the market value of the property (including inventory), or at the option of the owner, the historical cost when new." *Id.* § 22.01(5) (West 2015).

64

issues challenging the legal and factual sufficiency of the evidence to support the trial court's finding of fact 58 and challenging the legal correctness of conclusion of law 7 determining that the replacement value of AHC's inventory is $13,385,969.37.

## D. Lost-Profits Damages

In its third issue, Wise Electric argues that the evidence is legally and factually insufficient to support the trial court's award of lost profits, challenging findings of fact 42 through 52 and the legal correctness of conclusions of law 8 and 11. Having already determined that replacement value was a proper measure for the personal-property damages awarded, we need not address Wise Electric's contentions that lost profits are not available in cases in which fair-market-value damages are awarded.[31]

### 1. Evidence of Lost Profits

### a. Testimony of Keith Maddox

The fire required AHC to stop manufacturing until the plant and machines were cleaned and AHC had received new inventory. The fire occurred on November 27, 2005. After the fire, according to Maddox and AHC's plant

---

[31]The cases relied upon by Wise Electric preclude a recovery of lost profits only to the extent lost-profits damages are encompassed in a fair-market-value damage recovery; the cases do not preclude the recovery of future, unaccounted for lost profits if such are necessary for fair compensation to an injured party. And the lost-profits summary, which is set forth in Exhibit F in the report of AHC's lost-profits expert Shipp, explicitly states that inventory value is not included in the lost-profits analysis; it states, "This analysis assumes that a separate claim will be filed for the value of the inventory."

manager, AHC ceased manufacturing altogether for several months following the fire. Production did not recommence until January 2006 and then only partially. Maddox quantified AHC's January 2006 operational capacity to have been only fifteen percent. In contrast to that low capacity, Maddox testified that AHC had been operating at eighty percent capacity immediately before the fire, and he asserted that AHC did not regain that capacity until late 2010 because it lacked adequate inventory.

Maddox testified that hat sales are seasonal and that AHC's best sales months are December, January, and February, as demonstrated by the $1.2 million worth of completed, stage-three hats that AHC had ready to ship at the time of the fire on November 27, 2005.

Maddox explained that it takes three to six months to receive new felt hat bodies and six months to a year, sometimes even two years, to receive new straw hat bodies. Because the major retailers require prompt delivery of hat orders; because the major retailers often place large hat orders; and because of the time required to perform the multiple, labor-intensive manufacturing steps involved in transforming the hat bodies into completed, stage-three hats ready for shipment, AHC must maintain a large inventory of stage-one and stage-two hats on hand. As an example, Maddox said that if a major retailer places an order for hats on a Monday, it expects AHC to ship the order by Wednesday. If AHC misses that deadline, the retailer cancels the order and does not return for business.

Maddox stated that before the fire, AHC had never failed to meet an order's deadline.    But because the ordered, ready-to-ship stage-three hats in AHC's plant were smoke damaged, they were never shipped.   Customers told Maddox that they did not want the smoke-damaged hats, and because AHC had no inventory that was not smoke damaged, it could not fill orders.

After the fire, when AHC ordered inventory, it was forced to order the inventory in smaller quantities because AHC's income from hat sales had ceased and because inventory is expensive; AHC was also forced to pay extra to have the smaller inventory quantities air-freighted to minimize the typical three- to six-month delivery time associated with shipping by sea container.   Consequently, after the fire, AHC received and manufactured inventory haltingly; it would make hats for about five or six days but then have to stop and wait for a week or two until new inventory arrived.   Because AHC lacked adequate inventory to timely fill orders, it lost all of its major-retailer customers and the weekly orders that the major retailers had placed.   It took five years for AHC to regain most of its customers and to regain its pre-fire level of production.   At the time of the second trial, AHC had an inventory of 50,000 hat bodies, and Maddox considered even that to be a limited inventory.

## b. Testimony of Shannon Shipp[32]

Shipp calculated AHC's total profits lost as a result of the fire to be $5,100,379; Shipp's fifteen-page report, with thirteen exhibits totaling an additional twenty-one pages, was admitted into evidence. Shipp's testimony and report explain that his analysis of AHC's lost profits for each year "includes the following elements: the duration of the future lost profits, but-for sales, but-for expenses, and but-for net income[;] mitigating sales, mitigating expenses, and mitigating net income[;] lost profits[;] and discount to present value." A narrative portion of the report explains the meaning of each of these terms and the methodology Shipp utilized to arrive at the number associated with each term for each year that AHC's lost profits continued. Shipp noted in his report that "[a]s of the date of this report, AHC has seven years of sales data since the fire."

The thirteen exhibits attached to Shipp's report detail the mathematical calculations he utilized and contain charts documenting the supporting data for each underlying calculation. In addition to setting forth Shipp's valuation methodology and result, Shipp's report lists ninety-nine documents that Shipp reviewed in conducting his lost-profits analysis. Shipp calculated AHC's lost profits for 2005 and for the five years following the fire up through December 31,

---

[32]Wise Electric challenges discrete aspects of Shipp's testimony and computations. Our factual recitation of Shipp's testimony and the computations in his lengthy report is not exhaustive; we focus on providing a factual background concerning the specific areas of Shipp's testimony challenged by Wise Electric.

2010, when AHC regained its pre-fire manufacturing capacity; the results of his computations are set forth in Exhibit F of his report, the final page of the report.[33] Exhibit F of Shipp's report shows that for each year from 2005 through 2010, Shipp calculated figures for twelve categories of data; he calculated but-for figures and mitigating/actual figures for the twelve categories and subtracted the mitigating/actual figures from the but-for figures to arrive at the lost-profits figures. Shipp's final lost-profits computations correlate with the trial court's findings of fact concerning the yearly lost profits suffered by AHC for the years 2005 through 2010.

Shipp testified that the standard in his field is to calculate the losses sustained until the company is able to accomplish what it would have accomplished as of the date of the loss. Shipp originally determined the duration would last through 2011, but before the second trial, he modified his assessment downward because AHC had, in fact, rebounded quicker than he had expected. Shipp and Maddox agreed that by December 2010, AHC was operating at a pre-fire level and was no longer suffering lost profits.

Shipp explained how he had computed the elements of his lost profits analysis. For example, in calculating AHC's December 2005 but-for sales, Shipp included the loss of sales of the completed, stage-three hats that had been ordered and were ready to be shipped on November 27, 2005, when the fire

---

[33]A copy of Exhibit F from Shipp's report is attached hereto as Appendix B.

occurred. Shipp added to that number an estimated sale of one-third of the stage-two hats that AHC had stored inside the plant, which he projected would sell based on his analysis of AHC's January 2005 and February 2005 high-season sales pattern. The methodology, assumptions, and calculations performed by Shipp to determine 2005 but-for sales are set forth in Exhibits A and A-1 attached to his report. Shipp projected AHC's but-for sales for 2005 to be $1,150,377. As a "reality check" to test the validity of his 2005 forecast, Shipp compared his 2005 but-for sales projection to the actual sales achieved by AHC in 2006 despite the fire; the actual sales that AHC was able to achieve in 2006 during its significantly-reduced manufacturing capability established that Shipp's 2005 but-for sales figure was accurate.[34]

To calculate but-for sales for the years 2006 through 2010, Shipp talked with Maddox and the employees in AHC's finance department and reviewed AHC's financial statements; Startz's report; and "the sales break out that [AHC's finance department] prepared showing sales to independents, individuals, and the chain retailers." Shipp verified information that he had received from AHC by consulting books, articles, relevant seminar materials, and competitor information. Because sales to individuals were random and too difficult to

---

[34]Shipp testified that but-for sales for 2005 were calculated differently than but-for sales for the years 2006 through 2010 because the 2005 lost profits were concrete, constituting the already-ordered completed, stage-three hats awaiting shipping and approximately one-third of the stage-two hats stored inside AHC's plant.

predict, Shipp omitted them from his calculus. He testified that his lost-profits analysis was understated to the extent that it does not include AHC's lost sales to individuals. Shipp calculated a sales average for the remaining two markets—chain retailers and independent stores—by analyzing AHC's 2005 sales. Shipp explained that analyzing a whole year took into account seasonal sales.

Next, Shipp calculated a sales growth rate for each of the two markets for 2006 through 2010. Shipp found the growth rate in sales for independent stores by reviewing AHC's growth in that market before the fire. AHC had added fifty-two independent stores since mid-2004.[35] Shipp incorporated that rate of growth because the market supported it; according to Shipp, there are many independent stores, "a lot of smaller stores." Shipp calculated the estimated future growth in sales for the chain-retailer market to be ten percent, which reflected a growth in the number of hats and the styles of hats sent to each store as well as a growth in the number of stores within each chain to stock the hats. The methodology, assumptions, and calculations that Shipp specifically utilized to arrive at AHC's but-for sales for the years 2006 through 2010 are set forth in Exhibit B attached to his report.

Shipp then determined AHC's but-for expenses for the years 2005 through 2010—the expenses AHC would have incurred had the fire not occurred. In

---

[35]Shipp counted the number of independent stores added from the time AHC had relocated to Bowie, Texas, in March or April 2004 until the fire in November 2005.

computing but-for expenses for December 2005, Shipp considered the actual expenses AHC had incurred from January through November 2005. Shipp's calculations, methodology, and assumptions to determine but-for expenses for the years 2006 through 2010 are set forth in Exhibits C and C-1 attached to his report. Shipp estimated AHC's gross margin for 2005 and for the years 2006 through 2011 and calculated AHC's actual gross margin for the year 2011; these calculations are set forth in Exhibit E attached to his report. As a "reality check" on his but-for expense model and his gross-margin analysis, Shipp reviewed financial statements that existed for AHC before Maddox had purchased it two and one-half years earlier; Shipp examined the expenses, cost of goods sold, and gross margin for the company for that time period because the company had used the same production equipment and had many of the same customers and hat styles. He then compared the numbers from AHC's predecessor company with AHC's current numbers as a reality check that the current numbers were in line with the prior numbers.

After calculating the but-for expenses, Shipp subtracted them from the but-for sales to calculate but-for profits. Shipp subtracted from the but-for profits AHC's mitigating/actual profits for each year to reach the yearly lost-profits total.

Shipp explained that prior to the present suit by AHC against Wise Electric, AHC had sued Travelers to recoup fire damages covered by AHC's commercial property and casualty insurance policy with Travelers. Pursuant to the terms of AHC's insurance policy, each party selected an appraiser, and the trial court

72

appointed Frank Douthitt as an umpire to appraise AHC's damages. Shipp appraised for AHC. The coverage page of AHC's policy with Travelers was introduced into evidence, and it shows limits of $1,500,000 on the building AHC rented for its manufacturing plant; $2,000,000 for business personal property; and $500,000 for business income and extra expense. Shipp and Douthitt agreed that as of February 28, 2007, AHC's "business profit loss"—which Douthitt also characterized as payment for "business interruption"—computed according to the terms of, and the coverage provided by, AHC's policy was $332,921.80, and the trial court's judgment in AHC's suit against Travelers awarded that amount. During this trial, Shipp explained that the $332,921.80 figure was calculated in the context of the terms and coverage of AHC's commercial property and casualty insurance policy with Travelers. Shipp testified that the actual lost profits suffered by AHC during the "business interruption" loss period covered by its policy exceeded $332,921.80 and referred to his report as including a correct computation of AHC's lost profits during that period.

### c. Testimony of Dennis Ray McBay

Dennis Ray McBay—a retired partner emeritus with an international accounting firm and certified public accountant, certified valuation analyst, and certified financial forensics analyst—disagreed with Shipp. McBay testified that he was hired by Travelers and stated that "my charge was to calculate lost earnings due to the partial interruption of business as a result of the smoke

73

damage." McBay worked with Scott Dau of Travelers in assessing this loss; McBay prepared a report for Travelers dated February 27, 2006, and it was introduced into evidence.

McBay concluded that AHC had suffered a partial business interruption for only three months. McBay determined that AHC's "business income loss" was $101,934.50 for the three-month period following the fire. McBay expressed his opinion that AHC was able to return to pre-fire sales and production in March 2006—three months after the fire, but he conceded that he had not seen or reviewed any March 2006 numbers.[36] According to McBay, Shipp's calculations were wrong because "the driver for his [Shipp's] calculation is the lost inventory" and the time and expense required to replace it. In performing his calculations, McBay assumed that "raw material that's already in-house is not the only raw material available."

McBay testified that he did not analyze the fire's long-term effect on AHC's profits. McBay authored his report for Travelers on February 27, 2006, and he acknowledged during cross-examination that he had not returned to AHC's plant since February 2006 and had no personal knowledge of its level of productivity after February 2006. On cross-examination, McBay's testimony that he had

---

[36]McBay agreed that in February 2005, AHC had total sales receipts of $114,531 and that in February 2006, that number was $53,487, but he insisted that by February 2006, AHC was operating at pre-fire capacity and sales. He admitted that he was using low sales months to compute average sales for the seasonal high-sales months of December, January, and February. He conceded that he did not take into account seasonal sales whatsoever.

74

determined AHC's three-month business interruption period was impeached; McBay admitted that he had testified at the first trial that the three-month time period had been dictated to him by Travelers. And subsequently in the second trial, he reverted to his prior testimony and agreed that "partial suspension for three months" was a term dictated to him by Travelers.

McBay admitted that his calculations did not account for seasonal sales, and unlike Shipp, who had reviewed sales for all of 2005, McBay's computations of lost sales—for the three-month business interruption period covered in his report—averaged sales based only on sales during the eighty-seven days preceding the fire. McBay admitted that his report expressly states that it is not to be used for any other purpose other than evaluating AHC's insurance claim for three months of business-interruption coverage; he agreed that the report was never intended to be used at trial. Also unlike Shipp, McBay did not factor into his calculation the $1.2 million worth of completed, stage-three hat inventory ready for shipment at the time of the fire; McBay testified that he was unaware that this inventory existed until he reviewed Shipp's report. Neither did McBay account for different market types.

McBay acknowledged that his lost-profits assessment assumed two things: (1) AHC did not lose any customers, and (2) AHC could timely obtain new inventory. McBay did not know how long it actually took for new inventory to arrive; he was unaware of the testimony that it took months or years to obtain

75

inventory. He agreed that his numbers "might" change if these two assumptions were incorrect.

### d. Testimony of Scott Dau

Scott Dau's testimony from the first trial was admitted as an exhibit in the second trial. As part of his duties for Travelers, Dau was to collect facts concerning "what [AHC]'s business or lost-business claim was from the period after the fire." Dau observed that in February 2006, AHC's plant was in operation. Dau worked with McBay and utilized McBay's business-interruption loss calculation in the statement of loss he prepared. On cross-examination, Dau explained that the $101,934.80 business-interruption loss on his statement of loss was for three months of business interruption. When asked what business-interruption loss described, Dau said, "Business interruption is a downtime after the loss." According to Dau, the loss is the net loss of income during that downtime.

### 2. Applicable Law on Past Lost Profits

"[W]here it is shown that a loss of profits is the natural and probable consequence of the act or omission complained of, and their amount is shown with sufficient certainty, there may be a recovery therefor." *Sw. Battery Corp. v. Owen*, 131 Tex. 423, 426, 115 S.W.2d 1097, 1098 (1938). "Recovery for lost profits does not require that the loss be susceptible to exact calculation. However, the injured party must do more than show that it suffered some lost profits. The loss amount must be shown by competent evidence with reasonable

76

certainty." *Helena Chem. Co.*, 47 S.W.3d at 504 (citations omitted). "Reasonable certainty" in the proof of lost damages "is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise." *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994). It is a fact-intensive determination. *Helena Chem. Co.*, 47 S.W.3d at 504; *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). At a minimum, opinions or lost-profits estimates must be based on objective facts, figures, or data from which the lost-profits amount may be ascertained. *Helena Chem. Co.*, 47 S.W.3d at 504; *Holt Atherton Indus., Inc.*, 835 S.W.2d at 84. It is not necessary, however, to produce in court the documents underlying the opinions or estimates. *Holt Atherton Indus., Inc.*, 835 S.W.2d at 84.

"Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered." *Tex. Instruments, Inc.*, 877 S.W.2d at 279; *see Sw. Battery Corp.*, 131 Tex. at 426, 115 S.W.2d at 1098. "Enterprise" does not mean business entity; it refers to the activity that is alleged to have been damaged. *Tex. Instruments, Inc.*, 877 S.W.2d at 280. "The focus is on the experience of the persons involved in the enterprise and the nature of the business activity[] and the relevant market." *Id.*

77

Proof of lost damages can be accomplished with evidence of profit history.

*Helena Chem. Co.*, 47 S.W.3d at 504. The Texas Supreme Court has explained that

> [p]re-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. It is permissible to show the amount of business done by the plaintiff in a corresponding period of time not too remote, and the business during the time for which recovery is sought.

*Tex. Instruments, Inc.*, 877 S.W.2d at 279 (quoting *Sw. Battery Corp.*, 131 Tex. at 426, 115 S.W.2d at 1099). "Furthermore, in calculating the plaintiff's loss, it is proper to consider the normal increase in business which might have been expected in the light of past development and existing conditions." *Id.*

### 3. Legally and Factually Sufficient Evidence Supports the Lost-Profits Award

Wise Electric's sufficiency challenge focuses on Shipp's report and testimony. Wise Electric asserts that Shipp's calculus is flawed because he relied upon Startz's report's tabulation of AHC's inventory. Because we have already determined that Startz's report was not unreliable, and because Shipp testified that a damages analyst typically relies on such data and information provided by others, the tabulations of inventory in Startz's report was not an improper source for Shipp to have used. *See* Tex. R. Evid. 703 (authorizing expert to base opinion on facts or data in the case that the expert has been made aware of or has reviewed if experts in his field would rely on the facts in forming an opinion).

78

Wise Electric challenges Shipp's computation of a particular element of his lost-profits analysis—AHC's 2005 "but-for" sales. To calculate AHC's 2005 but-for sales, Shipp totaled the sales of the completed, stage-three hats in the plant and the sales of one-third of the stage-two hats in the plant. Wise Electric argues that Shipp merely speculated that AHC would sell all of the stage-three hats stored in AHC's plant at the time of the fire. But Maddox testified that the stage-three hats in the plant awaiting shipping had been manufactured in response to orders. And Shipp's and Maddox's testimony established that AHC converted stage-two hats to stage-three hats only to fill orders; the sweat bands sewn into the hats frequently bore the label of the retailer purchasing the hat, which would not be known until the retailer placed an order for the hats. Therefore, it was not speculative that AHC would sell the completed, stage-three hats that Maddox testified had been ordered and were awaiting shipping. And although Wise Electric faults Shipp for not supporting his December 2005 valuation with purchase orders, it is not necessary that such documents be produced in court to establish lost profits with reasonable certainty. *See Holt Atherton Indus., Inc.*, 835 S.W.2d at 84 (explaining that "[a]lthough supporting documentation may affect the weight of the [lost-profits] evidence, it is not necessary to produce in court the documents supporting the opinions or estimates").

Wise Electric also faults Shipp's determination in computing the element of 2005 but-for sales that AHC would sell one-third of the 15,786[37] stage-two hats that were stored in the factory (approximately 5,262 hats). But that determination came from Shipp's assessment of the market for the peak season of December through February. Given that from January 2005 through November 27, 2005, AHC had sales of $938,333 and was manufacturing 360 hats per day at the time of the fire, the projected completed manufacture and sale of 5,262 stage-two hats (263 per day assuming only twenty work days in December) during a peak sales month is in line with past production. And to ensure the overall reasonableness of his 2005 December "but-for" sales figure, Shipp compared his projected 2005 sales to AHC's actual 2006 sales, accounting for AHC's then-diminished operational capacity, and concluded that his 2005 assessment, including December, was accurate. Shipp's use of AHC's past profits to forecast future ones was appropriate. *See Helena Chem. Co.*, 47 S.W.3d at 504 (holding past profits, coupled with other facts and circumstances, may establish lost profits); *Tex. Instruments, Inc.*, 877 S.W.2d at 279 (same).

Wise Electric next asserts that Shipp's report and testimony are devoid of facts, figures, or data. Shipp listed the numerous sources of information and

---

[37]As previously mentioned, Startz's spreadsheet detailed for each of AHC's 490,092 hats and hat bodies whether it was stored inside AHC's plant or in a sea container outside at the time of the fire. Shipp's report indicates that 15,786 stage-two hats were stored inside AHC's plant at the time of the fire; one-third of 15,786 is 5,262.

80

data that he had utilized in reaching his conclusions; he listed ninety-nine documents that he had reviewed in reaching a lost-profits computation. In his report and in the exhibits attached to it, he explained his calculus and the steps he took to ensure its reasonableness. Shipp's report, including back-up figures and data, was admitted into evidence. We cannot agree that Shipp's report and testimony are devoid of facts, figures, or data. *Compare Helena Chem. Co.*, 47 S.W.3d at 504 (explaining proper calculation of lost profits), *with Holt Atherton Indus., Inc.*, 835 S.W.2d at 84 (explaining that plaintiff's mere statement that he "lost out on" $200,200 in income coupled with a statement as to profits shown on an income tax return constituted insufficient evidence of lost profits), *and Capital Metro. Transp. Auth. v. Cent. of Tenn. Ry. & Navigation Co.*, 114 S.W.3d 573, 581 (Tex. App.—Austin 2003, pet. denied) (holding evidence insufficient to support jury's $1.5 million lost-profits award when expert's computations were not based on facts, figures, or data because computations ignored reality that plaintiff company "had a history of losses and had never made a profit on its operations").

Wise Electric also challenges Shipp's computation of the 2006 to 2010 "but-for" sales element of his lost-profits analysis, claiming that Shipp's numbers are overly speculative, especially regarding AHC's estimated growth rates for the chain retailer market and the independent store market. But Shipp's proffered growth rates stemmed from AHC's prior increases in sales in these two markets, and Shipp detailed the differences between the growth rates for the two markets and the method he had used to accommodate them. Shipp's growth rates

81

accorded with AHC's trending sales and the overall hat market. *See White v. Sw. Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex. 1983) (stating that "in calculating the loss in profits, the normal increase in the business which might have been expected in the light of past developments and existing conditions may be considered"); *Sw. Battery Corp.*, 131 Tex. at 427, 115 S.W.2d at 1099 (same); *see also Fleming Mfg. Co. v. Capitol Brick, Inc.,* 734 S.W.2d 405, 407–08 (Tex. App.—Austin 1987, writ ref'd n.r.e.) (including analysis of sales projections derived from past sales in lost-profits analysis). Moreover, no controverting evidence exists in the record showing any other growth rate should be applied or undermining the data utilized or the computations performed by Shipp to arrive at the growth rates he utilized.

Additionally, the western-hat market is neither new nor uncertain, and cowboy hats are not untested products. *Compare White*, 651 S.W.2d at 262 (holding that evidence showed Hewlett-White florist shop had been an established business for thirty-three years and that the sale of flowers was not an uncertain or speculative business so as to preclude lost-profits award), *with Tex. Instruments, Inc.*, 877 S.W.2d at 279 (holding lost-profits award based on projected sales of a product not yet developed to the point of a working model too speculative because no evidence existed that the product had been sold to anyone). To the contrary, Maddox testified that AHC had been making hats since he was a child and that the first cowboy hat he had owned was an AHC hat. Maddox also testified that the materials and processes for manufacturing

cowboy hats had not changed in a hundred years. AHC's hat-manufacturing business falls squarely within the line of cases for which lost profits may be proved with reasonable certainty. *See, e.g.*, *White*, 651 S.W.2d at 262 (flower sales); *Sw. Battery Corp.*, 131 Tex. at 426, 115 S.W.2d at 1098 (battery sales).

In summary, Shipp's testimony and report demonstrate that his calculations of AHC's lost profits are damages for the loss of net income to AHC. *See Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002). His calculations appropriately reduce AHC's lost profits by the but-for expenses AHC would have incurred to attain those profits. *See generally Capital Metro. Transp. Auth.*, 114 S.W.3d at 581–82 & n.7 (considering both income projections and specific expenses when evaluating proof of lost profits). And Shipp's lost-profits computations—as reflected in Exhibit F of his report, which pulls forward figures calculated in detail on other Exhibits attached to his report—constitute one complete lost-profits calculation. *See Holt Atherton Indus., Inc.*, 835 S.W.2d at 85 (stating that "[r]ecovery of lost profits must be predicated on one complete calculation"). And finally, Shipp's fact-intensive lost-profit analysis shows AHC's lost profits for the years of 2005 through 2010 with reasonable certainty. *See, e.g.*, *Helena Chem. Co.*, 47 S.W.3d at 504.

Viewing all of the lost-profits evidence in the light most favorable to the trial court's judgment and disregarding the contrary evidence that a reasonable factfinder could, we hold that the trial court's yearly lost-profit awards are supported by more than a scintilla of evidence. *See Rocor Int'l*, 77 S.W.3d at

262; *Cont'l Coffee Prods. Co.*, 937 S.W.2d at 450; *Leitch*, 935 S.W.2d at 118.

Considering and weighing all of the evidence in the record pertinent to the lost-profits award, the credible evidence supporting the finding is not so weak, nor is the contrary evidence so overwhelming, that the finding should be set aside and a new trial ordered. *See Pool*, 715 S.W.2d at 635; *Cain*, 709 S.W.2d at 176. Accordingly, we overrule Wise Electric's third issue challenging the legal and factual sufficiency of the evidence to support findings of fact 42 through 52 and to the legal correctness of conclusions of law 8 and 11.[38]

## V. COLLATERAL ESTOPPEL

Wise Electric's sixth issue argues that AHC is collaterally estopped from recovering lost profits because AHC already recovered them—specifically the $332,921.80 business-interruption loss awarded in AHC's suit against Travelers. The trial court found in conclusions of law 12 and 13 that the evidence was insufficient to support applying collateral estoppel. Whether collateral estoppel bars AHC's recovery is a question of law that we review de novo.[39] *See*

---

[38]Because we have held that the evidence is legally and factually sufficient to support the trial court's inventory and lost-profits damages, we need not address Wise Electric's fourth issue, arguing that the evidence is insufficient to support damages exceeding $2.6 million. *See* Tex. R. App. P. 47.1 (requiring appellate court to address issues necessary for final disposition of appeal).

[39]Because whether or not collateral estoppel applies is a question of law, we disagree with Wise Electric's assertion that AHC judicially admitted—in a motion for partial summary judgment—that collateral estoppel applied to lost-profit damages; even if AHC's motion could be so construed, judicial admissions are statements of fact rather than law. *See, e.g., H2O Solutions, Ltd. v. PM Realty Grp., LP*, 438 S.W.3d 606, 617 (Tex. App.—Houston [1st Dist.] 2014, pet.

*Quanaim v. Frasco Rest. & Catering*, 17 S.W.3d 30, 44–45 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

Collateral estoppel is an affirmative defense, giving defendants the burden of pleading and proving it. *See Sysco Food Servs. v. Trapnell*, 890 S.W.2d 796, 802 (Tex. 1994). To carry that burden, a party must establish that (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action, (2) those facts were essential to the judgment in the first action, and (3) the parties were cast as adversaries in the first action. *See Allen v. McCurry*, 449 U.S. 90, 94–95, 101 S. Ct. 411, 414–45 (1980); *Sysco Food Servs.*, 890 S.W.2d at 801; *Am. Hat Co.*, 2010 WL 4028098, at *7. "Full and fair litigation" means actual litigation in the previous suit of the same fact issues. *See Puga v. Donna Fruit Co.*, 634 S.W.2d 677, 680 (Tex. 1982).

The record shows that Douthitt's appraisal award was calculated pursuant to the provisions in AHC's commercial property and casualty insurance policy. Shipp explained that the appraisal award did not reflect AHC's actual lost profits, even for the period it covered. Because the fact issue of AHC's lost profits caused by the fire (as opposed to the amount of the business-interruption loss

denied); *see also Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568 (Tex. 2001) (defining judicial admissions as factual statements). Moreover, Wise Electric did not object to AHC's evidence of greater lost-profits evidence, waiving any judicial-admission argument. *See, e.g.*, *Marshall v. Vise*, 767 S.W.2d 699, 700 (Tex. 1989) ("[A] party relying upon an opponent's pleadings as judicial admissions of fact must protect the record by objecting to the introduction of controverting evidence and to the submission of any issue bearing on the facts admitted.").

covered under the terms of AHC's commercial property and casualty policy with Travelers) was not fully litigated in AHC's prior lawsuit against Travelers, collateral estoppel does not apply to this element of damages. *See Allen*, 449 U.S. at 94–95, 101 S. Ct. at 414–45; *Sysco Food Servs.*, 890 S.W.2d at 801; *Puga*, 634 S.W.2d at 680. We overrule Wise Electric's sixth issue.

## VI. OFFSET

AHC perfected its own appeal and raises a single issue. AHC asserts that the judgment erroneously awards Wise Electric an offset of $2,578,067.00. AHC argues that Wise Electric did not plead offset and did not put on evidence establishing its right to an offset.[40]

## A. Facts and Law Relating to Offset

After AHC sued Wise Electric, Travelers intervened and asserted a subrogation claim against Wise Electric for $2,578,067.00. Subsequently, Travelers and Wise Electric entered a mediated settlement agreement whereby Wise Electric paid $1,900,000.00 to settle Travelers's claims in intervention, and Travelers assigned its "entire priority claim interest" in the amount of $2,578,067.00 from any recovery by AHC in the present suit. Immediately prior to resting its case, Wise Electric offered the one-page mediated settlement agreement into evidence and read it *in toto* to the trial court.

---

[40]AHC challenges finding of fact 61 and conclusions of law 14 and 15 to the extent they may also be construed as findings of fact.

## B. The Law Concerning Pleading Offset

Courts are to construe pleadings so as to do substantial justice. Tex. R. Civ. P. 45. The purpose of pleadings is to give adversaries notice of each party's claims and defenses, as well as notice of the relief sought. *Perez v. Briercroft Serv. Corp.*, 809 S.W.2d 216, 218 (Tex. 1991). Generally, courts will construe pleadings as favorably as possible to the pleader. *Gulf, Colo. & S.F. Ry. v. Bliss*, 368 S.W.2d 594, 599 (Tex. 1963); *Henderson v. Henderson*, 694 S.W.2d 31, 36 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.). If pleadings fairly notify the other party of the basis of the pleader's claims, they are sufficient. Tex. R. Civ. P. 45, 47; *Schoellkopf v. Pledger*, 778 S.W.2d 897, 899 (Tex. App.—Dallas 1989, writ denied). "The right of offset is an affirmative defense. The burden of pleading offset and of proving facts necessary to support it are on the party making the assertion." *Brown v. Am. Transfer & Storage Co.*, 601 S.W.2d 931, 936 (Tex.), *cert. denied*, 449 U.S. 1015 (1980).

## C. Wise Electric's Pleadings Are Sufficient to Support Offset

In the list of affirmative defenses asserted in its Third Amended Original Answer, Wise Electric pleaded:

> Defendant affirmatively asserts its rights pursuant to Chapters 32 and 33 of the Texas Civil Practice and Remedies Code with regard to contribution and/or a settlement credit election in the event either the Plaintiff or the Plaintiff/Intervenor settles with any individual or entity for damages arising out of the incident made the basis of this suit.

87

At least one court has held that this type of pleading, liberally construed, constitutes a claim for an offset. *See Hartnett v. Hampton Inns, Inc.*, 870 S.W.2d 162, 167 n.6 (Tex. App.—San Antonio 1993, writ denied) (liberally construing pleading for settlement credit that cited civil practice and remedies code section 33.014 as pleading affirmative defense of offset). Because we are to liberally construe pleadings to do substantial justice and because the record establishes that AHC was on notice of Wise Electric's claim for a discount on the judgment based on its mediated settlement agreement with Travelers, we hold that Wise Electric sufficiently pleaded offset.[41] *See* Tex. R. Civ. P. 45; *Perez*, 809 S.W.2d at 218; *Bliss*, 368 S.W.2d at 599; *Hartnett*, 870 S.W.2d at 167 n.6.

## D. Factually Insufficient Evidence Exists Concerning Amount of Offset

The evidence relating to the amount of offset comes from the one-page memorialization of the confidential mediated settlement between Wise Electric and Travelers,[42] limited testimony by Maddox, and one statement by Shipp. The settlement agreement simply states that Travelers paid AHC $2,578,067.00. It does not contain attachments, explanations, or breakdowns of Travelers's payments. Maddox testified that Travelers had paid "nearly $2.7 million" total on AHC's claim under its policy. It is clear that Travelers paid AHC the policy's $2-

---

[41]Because offset was sufficiently pleaded, we need not address the issue of whether offset was tried by consent.

[42]Travelers's plea in intervention is in the record, but it provides no details or attachments showing how the alleged $2,578,067.00 number was reached.

88

million-dollar limit for AHC's "business personal property" damages, but AHC's business-personal-property damages included equipment and items other than inventory. And the total monies paid by Travelers included cleaning expenses, building loss, business-personal-property damages, and business-interruption damages. Payments were also made for fence repair, trailer rentals, and air-conditioning work. Wise Electric asked Shipp if he knew that AHC had received $2.7 million from its insurer, and Shipp responded, "[T]he exact number, I didn't know, but it was over $2 million." The number $2,578,067.00 was not mentioned at trial except when Wise Electric read the settlement agreement as it moved to admit it.

We recognize that an insurance policy may provide contractual, first-priority, dollar-for-dollar subrogation rights. *See, e.g., Fortis Benefits v. Cantu*, 234 S.W.3d 642, 648 (Tex. 2007) (holding subrogation clause that granted insurer a right of recovery against "any and all" third-party settlements authorized insurer to recoup first-priority, dollar-for-dollar recovery from plaintiff's settlement); *Hartnett*, 870 S.W.2d at 167 (construing similar policy language similarly); *see also Gotham Ins. Co. v. Warren E & P, Inc.*, 455 S.W.3d 558, 563–64 (Tex. 2014) (limiting intervenor insurer's recovery from third party sued by insured to contractual provisions of insurance policy). But here, only a few pages of AHC's commercial property and casualty policy with Travelers were offered into evidence, and those pages do not include whatever contractual subrogation provisions may exist in the policy. So we are not able to discern the terms of the

89

subrogation rights that Travelers assigned to Wise Electric by virtue of the mediated settlement agreement or to determine the propriety of the amount of the offset awarded under the controlling terms of AHC's policy.

Under these circumstances, viewing the evidence in the light most favorable to the trial court's findings, Wise Electric established its entitlement to some amount of offset. But given that the evidence does not show how the intervenor or Wise Electric arrived at the $2,578,067.00 number; its relation to the alleged $2.7 million briefly referenced at trial; the fact that this number included payments under the policy for damages other than those at issue in the trial—the only personal-property damages sought at trial were for inventory; and the fact that AHC's insurance policy was not introduced into evidence, considering and weighing all of the evidence concerning the amount of the offset Wise Electric is entitled to, we hold that the evidence concerning the proper amount of an offset is so weak that the trial court's finding of an offset amount of $2,578,067.00 must be set aside and a new trial ordered on Wise Electric's offset counterclaim. *See Pool*, 715 S.W.2d at 635; *Cain*, 709 S.W.2d at 176; *see also Edlund v. Bounds*, 842 S.W.2d 719, 732 (Tex. App.—Dallas 1992, writ denied) (affirming judgment for plaintiff but reversing and remanding defendant's counterclaim for conversion). Because the evidence is factually insufficient to support an offset in the amount of $2,578,067.00, we sustain AHC's sole issue in its appeal.

## VII. CONCLUSION

Having overruled Wise Electric's seven issues, we affirm the trial court's judgment as to liability, personal property damages, and lost-profits damages.

Having sustained AHC's sole issue in its appeal, we reverse the trial court's $2,578,067.00 awarded to Wise Electric on its counterclaim for offset, we sever the counterclaim, and we remand it to the trial court for further proceedings.[43]

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: GARDNER and WALKER, JJ.[44]

DELIVERED: September 17, 2015

---

[43] *See, e.g., 7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 493 (Tex. App.—Houston [14th Dist.] 2007, pets. denied) (op. on reh'g) (affirming judgment on jury verdict as to liability and damages but reversing, severing from judgment, and remanding claim for attorney's fees); *Rogers v. Gen. Motors Acceptance Corp.*, 567 S.W.2d 576, 577 (Tex. Civ. App.—Beaumont 1978, no writ) ("We sever Rogers and Ward's counterclaim, and reverse this portion of the judgment for further proceedings.").

[44] Justice McCoy was a member of the original panel but has retired.

**APPENDIX A**

No. 2007-0000383M-CV

FILED FOR RECORD
DISTRICT CLERK

2013 SEP 18 AM 8:21

MONTAGUE COUNTY

AMERICAN HAT COMPANY

IN THE DISTRICT COURT OF

v.

MONTAGUE COUNTY, TEXAS

WISE ELECTRIC COOPERATIVE, INC.

97TH JUDICIAL DISTRICT

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**NOW COMES** the Court, having heard the evidence and argument of counsel in this cause and make the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Wise County Electric Cooperative, Inc., hereinafter referred to as Wise Electric, distributes and sells electricity in Montague County, Texas.

2. All acts and omissions attributed to Wise Electric in these Findings of Fact and Conclusions of Law were performed by officers, employees and/or agents of Wise Electric.

3. Wise Electric installs and maintains poles and lines to facilitate the distribution of electricity in Montague County, Texas.

4. Wise Electric installed and maintained poles, lines and related equipment at 3859 Jackson Road, Bowie, Montague County, Texas, also known as pole number 04610.

5. Wise Electric was solely responsible for the installation and maintenance of the poles, service lines, and related equipment at 3859 Jackson Road, Bowie, Montague County, Texas 76230.

6. A pole located on said property was approximately 50 feet away from pole number 04610 on the same property.

7. The pole nearest the farm house had a distribution transformer near its top. A triplex

729

service drop consisting of two lines and a neutral line ran from the first pole to pole number 04610.

8. The service drop wires from the first pole were connected to a weatherhead near the top of pole number 04610.

9. Wise County spliced or connected the triplex service drop connector lines with those from the weatherhead at pole 04610 by use of a devise manufactured for the purpose of securing such connections known as the Burndy Insulant. Specifically, subject #4 wire from the triplex was thus collected to the 1/0 wire from the weatherhead.

10. The standard practice in the electric utility industry regarding the Burndy InsuLink at the time of its use by linemen for Wise Electric was to place one end of a connector line into one end of the devise and to crimp the devise onto the wire inside by means a tool manufactured for this purpose known as the Ratchet Masher. That other connector line was then placed in the remaining open end of the Burndy InsuLink and crimped in a similar manner using the Ratchet Masher or another manual plier-type crimper.

11. Proper placement of the crimping devise on the Burndy InsuLink was indicted to the person crimping by means of marks on the exterior of the Burndy InsuLink made at the proper location for application of the crimping tool.

12. The use of the Ratchet Masher or the plier-type crimper resulted in visible deformation of the barrel of the Burndy InsuLink and was effective to hold the conductor line inside the Burndy Insulant-Link for an indefinite period of time.

13. The use of Burndy InsuLink has been abandoned by various utility companies due to instances of slippage of the wire inside the Burndy InsuLink-Link when not properly crimped.

14. The standard practice in the utility industry is for linemen, after crimping of connector lines inside the Burndy InsuLink, to conduct a "tug test" by tugging on the line inserted in the Insulant to determine if it comes loose from the connector.

15. The purpose of the "tug test" is to make sure that the connection is secure.

15. The line will not come loose from the Burndy Insulant if the crimping action has been successful.

15. The trainee linemen of Wise Electric were routinely taught by other employees to crimp both ends of conductor lines into the Burndy InsuLink connector and to conduct the "tug test" on the lines so crimped to determine if the crimping had been successfully accomplished.

16. The 'tug test' was not prescribed in instructional brochures supplied by Burndy or in written policies of Wise Electric.

17. The 'tug test' is not mandated by the National Electric Safety Code or other governmental or industry associations.

18. Failure to properly crimp a conductor line into a Burndy Insulant could result in the uncrimped line coming loose from the Insulant.

19. A Burndy Insulant connector that has been properly crimped in the process of installation will serve to maintain the connection indefinitely in the environmental conditions that normally obtain at that area, and extreme conditions such a wind speed and weight upon the link are unlikely to result in a connector line disconnecting from the Burndy Insulant.

20. If the lineman installing a Burndy Insulant connector fails to crimp both sides of this connector, it is reasonable foreseeable that the energized inserted in one end of the connector will come lose and cause an injury of the kind suffered by Plaintiff.

21. The Burndy Insulant connector used by Wise Electric to connect service wires from the first pole to pole number 04610 was not properly crimped on both sides of said connector so as to insure the line would remain securely in the Burndy InsuLink.

22. A "tug test" was not properly conducted on the wires inserted into this Burndy Insulant connector at the time of its installation.

23. Wise Electric failed to use ordinary care when it failed to properly crimp both sides of the Burndy Insulant connector.

24. Wise Electric failed to use ordinary care when it failed to properly perform a "tug test" on the wires inserted into the Burndy Insulant at the end of the connector's installation.

25. Wise Electric had no classes and no formal procedures in place during the period from the installation of this Burndy Insulant to the time of the fire hereinafter referenced which taught its linemen how to properly install that connector.

26. Wise Electric had schedule of replacement or maintenance during the period from the installation of this Burndy Insulant to the time of the fire hereinafter referenced to monitor whether connectors installed in this manner were properly functioning.

27. On November 27, 2005, a wildfire occurred in and around Bowie, Montague County, Texas.

28. That the point of origin for this fire was pole number 04610 owned and under the control of Wise Electric.

29. This pole and lines connected to it had been serviced last by Wise Electric in February, 1998.

30. This fire was caused when an electrically charged line that had come loose one end of the Burndy InsuLink-Link connector.

31. Electrical arcing occurred when the loose electrically charged line contacted a ground wire on the pole, producing an electrical spark that melted the end of the loose wire, resulting in molten material from the melted wire falling onto grass near the pole.

32. The effects of this fire were exacerbated by weather conditions at the time, particularly wind speeds reaching 60 miles per hour during the active phase of the fire.

33. Th fire consumed between 900 and 1,200 acres of land in the area before it was controlled.

34. The fire burned up to and around a manufacturing plant located at 3091 Highway 80, Bowie, Montague County, Texas, which was owned by American Hat Company, hereinafter referred to as American Hat.

35. American Hat was then and is now in the business of manufacturing and selling cowboy hats.

36. At the time of the fire, American Hat had inventory (hereinafter referred to as "Inventory") 490,092 hats in various stages of completion, located both in its manufacturing plant building and in outside storage containers.

37 The American Hat Inventory included hats and material no longer available in the market.

38. The American Hat Inventory included hot bodies obtained from China, Portugal, Germany and other countries.

39. The fire damaged the manufacturing plant building, and smoke and particles from the fire penetrated the building and the storage containers and the contents of them, damaging the Inventory located therein.

40. American Hat's Inventory cannot be cleaned of the smoke and particle damage so as to permit the Inventory being used or sold as new cowboy hats.

41. There is no market for the smoke damaged Inventory of American Hat.

42. American Hat's major sales season in the months of December, January, February and March, which fact required American Hat to produce and maintain sufficient inventory during the year to meet customer demand during this major season.

43. To rebuild its inventory of raw hat bodies following the fire, American Hat had to place orders to its suppliers in Texas, China, Portugal and other countries.

44. Because of the time required to obtain raw hat bodies from its suppliers, American Hat was unable to reach full production until October, 2006.

45. As a result of the damage to its Inventory from the fire and of its inability to meet customer orders after the fire, American Hat lost customers and sales that would otherwise have taken place had the fire not occurred.

46. American Hat did not reach its pre-fire level of production and sales until five (5) years after the fire.

47. American Hat's lost profits for the year 2005, were $787,851.

48. American Hat's lost profits for the year 2006, were $801,340.

49. American Hat's lost profits for the year 2007, were $848,775.

50. American Hat's lost profits for the year 2008, were $936,838.

51. American Hat's lost profits for the year 2009, were $773,693.

52. American Hat's lost profits for the year 2010, were $951,882.

53. Each of the 490,092 hats in American Hat's Inventory on the date of the fire was inspected and valued by Steve Starz.

54. Each that in the Inventory evaluation was placed in one of there categories: Stage 1 (raw hat bodies), Stage 2 (partially completed hats), and Stage 3 (fully completed hats).

55. Based on the stage of manufacture of the hats in Inventory, Steve Starz assigned a cash value to each hat in the Inventory immediately before the fire on November 27, 2005

56. The market value of the American Hat Inventory immediately before the fire on November 27, 2005, was $13,385,969.

57. The market value of the American Hat Inventory immediately after the fire on November 27, 2005, was $0.00.

58. The replacement value of the American Hat Inventory after the fire on November 27, 2005, was $13,385,969.

59. In the year 2008, Wise Electric had a net worth of $34,085,295.

60. In the year 2009, Wise Electric had a net worth of $38,112,350.00.

61. On or about November 19, 2008, Wise Electric agreed to pay to Travelers Lloyds Insurance Company ("Travelers"), the insurer of American Hat's Inventory, the sum of $1,900,000.00 in exchange for 1) a full release of Traveler's claims against Wise Electric and 2) an assignment of Traveler's entire priority claim interest in the amount of $2,578,067.00 from any recovery by American Hat.

62. On September 9, 2009, American Hat sold 1,330 of the smoke-damaged hats from its Inventory to Outback Traders of Australia a total sales price of $49,188.31.

63. There is no evidence that Outback Traders was able to resell the hats it purchased from American Hat's Inventory.

64. There is no evidence of any of the hats from American Hat's Inventory in Montague County, Texas, had any market value in Montague County, Texas, at the place of injury.

## CONCLUSIONS OF LAW

1.  Wise Electric was negligent in manner of the installation of the Burndy Insulant connector to splice the charged line going to from pole number 04610.

2.  Wise Electric's negligence caused the fire and the damages sustained by American Hat.

3.  Wise Electric's negligence was the sole proximate cause of the fire and of the damages sustained by American Hat.

4.  Wise Electric's installation of the utility line as described above did not constitute gross negligence in that there is no evidence that Wise Electric authorized the doing and manner of the installation here employed by its lineman.

5.  Burndy, a Division of FCI a/k/a FCI Burndy was not negligent .

6.  American Hat's Inventory immediately after the fire had a no fair market value.

7.  As a proximate cause of the negligence of Wise Electric, American Hat sustained damages to personal property in the amount of $13,385,969.34.

8.  As a proximate result of the negligence of Wise Electric, American Hat sustained lost profits in the amount of $5,100, 379.00.

9.  The rule of damages on personal property is that the measure of damages recoverable is the difference between the fair market value immediately before the damage is inflicted and the fair market value immediately afterward, determined at the place where the damage occurred.

10.  Because the damaged Inventory of American Hat has no market value at the place where the damage occurred, the proper measure of damages is the replacement value of the Inventory.

11.  American Hat is entitled to recover lost profits.

12. There is insufficient evidence from which to apply the doctrine of collateral estoppel either offensively or defensively in the present case.

13. There is insufficient evidence on which to apply the doctrine of collateral estoppel

14. All of the claims by Travelers against Wise Electric released in the November 19, 2008 Confidential Mediated Settlement Agreement were claims seeking recovery of damages to the property of American Hat.

15. Wise Electric is entitled to an offset of $2,578,067.00 against any recovery by American Hat by virtue of Travelers assignment of its entire priority claim interest in that amount to Wise Electric.

16. Wise Electric is entitled to a credit in the amount of $49,188.31 against the judgment awarded to American Hat due to sales receipts received from the sale of hats from its Inventory to a buyer in Australia.

17. To the extent that any finding of fact is, in whole or in part, a conclusion of law, the same is incorporated herein.

Signed 19 September 2013.

_____
Jack A. McGaughey, Judge Presiding

FILED: 9/19/13 @ 9:21 AM
RECORDED: 9/20/13 @ 9:33 AM
VOLUME 322 CIVIL MINUTES

**APPENDIX B**

American Hat Company
Exhibit F
Lost Profits Summary

Notes:
1. Federal Income Taxes are not considered in this analysis. See Robert L. Dunn, JD, Recovery of Damages for Lost Profits, 6th Edition, Westport, Conn.: Lawpress, 2005, page 507.
2. The damages were not discounted to present value. Because all damages are in the past period.
3. This analysis excludes assumptions regarding increases in business levels. See Robert L. Dunn, JD, Recovery of Damages for Lost Profits, 6th Edition, Westport, Conn.: Lawpress, 2005, page 550-552.
4. This analysis assumes that a separate claim will be filed for the value of the lost inventory.